NORMAN CUTTER, Respondent, *v.* WILLIAM WADDINGHAM *et al.,* Appellants.

33 269
97 536

*Estoppel—Vendee.*—A vendee holds adversely to his vendor, and is not estopped from denying his vendor's title.

*Evidence—Survey.*—The survey of a tract confirmed is conclusive upon the parties claiming under the confirmation, but the certificate of the surveyor, that the lot surveyed was the lot conceded to the confirmee, is not evidence of such fact, the confirmation not calling for the concession.

*Marriage Contract.*—Cutter v. Waddingham, 22 Mo. 206, p. 3, affirmed.

*Damages—Measure.*—The actual annual value of the property detained is the measure of damages in an action of ejectment; and the fact that plaintiffs and defendants are tenants in common makes no exception to the common rule.

Cutter v. Waddingham.

*Appeal from St. Louis Circuit Court.*

The legal title under which plaintiffs claimed was the act of Congress of April 29, 1816, confirming the claims recommended by Recorder Bates. The report of the recorder upon this claim was as follows:

| Warrant or order of survey. | Survey. | Notice to Recorder, by whom. | Quantity claimed. | Where sit't'd. | Poss. inhab'td or cultivated. | Opinion of Recorder. |
|---|---|---|---|---|---|---|
| Prov. Land B. No. 2, p. 29. | Not platted. | Lirette's representatives. | F. 167, 1 by 40 arpens. | St. L. out lot. | Poss. cult'v'd prior to 1803. | Con. 40 ar. to be surv. |

Province Land Book, No. 2, p. 29, contained the survey by Duralde, Surveyor General of Upper Louisiana, made between the year 1770 and 1772, and called for a lot of one by forty arpens in the St. Louis common field, bordering on one side immediately upon the domain of five and one-fourth arpens in width, and on the other upon Moreau.

Livre Terrein, No. 1, p. 27, contained a concession by St. Ange, dated July 17, 1769, to Louis Lirette, of a lot one by forty, bounded on one side by land of the widow Marechal, and on the other by that of Condé.

The act of sale of Louis Lirette to John B. Vifvarenne, dated August 20, 1774, executed before Lt. Gov. Piernas, described the land as 1 by 40, bounded on one side by widow Marechal, and on the other side by the domain of the king, or Señor Condé, and as being the same tract granted to Lirette, under the French government, by Messrs. the Commandant and Judge of this Province, according to the grant which the said Lirette has this day given up to the said Vifvarenne, &c.

J. B. Vifvarenne married Genevieve Cardinal August 6, 1777. His son J. B. Vifvarenne was baptized May 3, 1779. On January 1, 1781, a child aged fourteen months was buried. On August 18, 1780, a son, Louis, under whom plaintiff claims, was baptized. April 9, 1782, a son, François, was baptized.

The inventory of Genevieve Vifvarenne was made before Gov. Cruzat August 19, 1782, and stated that the governor went to the house of Genevieve Cardinal to make an inven-

tory of the property found belonging to her and to her two younger children living with her, and that the goods were committed to Mr. Sans Souci for safe keeping.

The account of sales made October 2, 1782, recited the sale at "auction, at the house of Genevieve Cardinal, of the effects which she left when she disappeared from this place, belonging to her and to her two children whom she took with her." U. S. survey 1479 recited that the survey was made of the tract, it being the tract of 1 by 40 arpens granted to Louis Lirette 17th July, 1769, by the Spanish authorities of the Province of West Louisiana, surveyed in the year 1770, 1771 or 1772, by Martin Duralde, &c. (See Liv. Ter. No. 1, p. 27, & No. 2, p. 29, in the office of the recorder of land titles, and confirmed to Lirette's representatives by act of Congress of 29th April, 1816. The survey recites that the tract of 40 arpens is bounded by the king's domain of $5\frac{1}{4}$ arpens and by Moreau's tract, and then gives courses and distances. The survey was executed October 19, 1826, and approved June 7, 1845.

The defendants claimed title through Genevieve Cardinal, widow of J. B. Vifvarenne.

*Field* and *Hill*, for appellants.

I. Estoppel binds only the parties to the transaction out of which it arises, and in respect to strangers never has any effect. It seems to be settled by authority that one decisive test of the binding force of an estoppel in a particular case is to inquire whether the person invoking it is himself bound by it. If he is not bound, he cannot claim the benefit of it. Coke says, "Every estoppel ought to be reciprocal, that is, to bind both parties, and this is the reason that regularly a stranger shall neither take advantage nor be bound by the estoppel." (Co. Litt. 352.) The distinction here pointed out by Coke will be found to be adopted in all the adjudged cases. Without citing the multitude of cases that are to be found in the common books of reference, it may be sufficient to direct the attention of the court to two comparatively re-

cent cases, in which this distinction has been acted on. (Gaunt v. Wainmann, 3 Bing, N. C. 69; Sparrow v. Kingman, 1 Comst. N. Y. 242; Co. Litt. 352; Macklot v. Dubreuil, 9 Mo. 477; Landes v. Perkins, 12 Mo. 238; Bogy v. Shoab, 13 Mo. 367.)

Sparrow v. Kingman, 1 Comst. 242, was a dower case, and the defendant went into possession under a deed of the husband transferring the fee. The doctrine of estoppel was invoked on behalf of the widow. But the court decided that the defendant might show, if he could, that the husband had no estate at all. A great number of previous decisions in New York were overruled by this decision. The attention of the court is invited to the opinions of the judges, as they review the general doctrine of estoppel with learning and candor.

If this old and established rule is adhered to, the error of the court below is manifest. The plaintiff was a stranger to the deeds out of which the supposed estoppel arose. He claimed the land in controversy by a title which, if good for anything, was paramount to any title in the parties to those deeds. Nothing that was said, done or transacted by those parties was admissible in evidence against him, much less could it bind him by estoppel.

The present suit was commenced in 1846, before the passage of the new practice act; and all the proceedings are regulated by the law as it stood anterior to 1849.

II. Under the general principles of the law applicable to all actions, if by any event pending the suit the plaintiff's right of action is determined, there can be no recovery.

The action of ejectment is mixed, being founded on the right to the possession of real property and to damages for withholding the intervening profits. It may well happen that pending the suit the plaintiff's right to the possession of the property may be lost, and his right to the rents and profits, during the time he was owner, continue. In such case the suit is not abated, but is limited to the recovery of damages.

We can therefore only reason from analogies furnished by cases under the fictitious action of ejectment adopted in the English courts. A striking analogy is furnished in the case of a transfer of interest, by the death of the lessor of the plaintiff in an English ejectment. By such transfer of interest, a pending suit of ejectment is reduced to a mere claim or damages, and the possession cannot be recovered. This was decided in the case of Thrustout v. Grey, 2 Strange, 1056. Mr. Adams, in commenting on this case, says a trial under such circumstances is unknown in practice, as the damages in the fictitious action of ejectment are merely nominal, and the executor of the lessor would have no claim to costs. (Adams' Ejec. 320.)

In many of the American States the rents and 'profits may be recovered directly in the original action of ejectment, and the English rule seems to have been adopted to allow a recovery for the rents and profits, in the name of the fictitious lessee, after the death of the lessor. (Kinney v. Beverly, 1 Hen. & Mun. 531; Jackson v. Davenport, 18 J. R. 295; Watson v. Tindal, 24 Georg. 494; Frier v. Jackson, 8 J. R. 507.)

In no case, however, is the nominal plaintiff allowed to recover the possession of the land after the death of the real plaintiff.

In Pennsylvania, (Regan v. Phillips, 4 Yeates, 382,) it is held that if pending the suit the title of the plaintiff be divested by act of law or his own act, he shall not recover possession, but may have his damages and costs. To the same effect is the case of Murray v. Garretson, 4 S. & R. 130. In Maryland, Cresap v. Huston, 9 Gill, 269; Carrol v. Norwood, 5 Harr. & J. 164. In Vermont, Benton v. Austin, 4 Vt. 105, and Cheney v. Cheney, 26 Vt. 606. Also, Torrence v. Betsey, 30 Miss. Rep. 129.

III. Proof was given on the part of the plaintiff, that if the premises had been free from litigation and had been put to rent, the rents and profits would have amounted to a sum justifying the finding of the jury. On the other hand, it was

shown that the rents and profits actually received by the defendants did not exceed the public charges.

Upon this evidence the defendants asked the following instruction :

" 25. If the jury find that the plaintiff and defendants, at the commencement of this suit, were respectively entitled to undivided interests in the lot in controversy, then the jury should find for damages no more than the proportional share of the plaintiff of the rents and profits actually derived by the defendants from said premises."

This instruction was refused, and the jury found for the plaintiff 11-15 of the land and gave to the plaintiff damages to the amount of $40,000, and assessed the monthly value of the plaintiff's share at $733, equivalent to $8,796 per annum.

The real point of dispute between the parties is whether one tenant in common can recover in ejectment from his co-tenant more than his share of the rents and profits *actually* received by such co-tenant.

The reasonable measure of damages in all cases is the value of the right of which the party has been deprived. It becomes necessary then to examine the relation of tenants in common to ascertain the value of a right which one withholds from the other. (Wheeler v. Horne, Willes, 208 ; Badger v. Holmes, 6 Gray, 118 ; Moses v. Ross, 41 Me. 360 : Ruffner v. Lewis, 7 Leigh, 720.)

*Glover & Shepley, Krum & Todd,* for respondent.

I. The defendants, having denied plaintiff's right *in toto* and excluded him from the land, was a trespasser and liable as such in tort, in which case the rule is always the actual damages and may be more. (11 Ired. 211 ; 9 Ired. 222 ; 3 Wilson, 118.) The plaintiff is not confined to the very mesne profits only, but may recover for his trouble. I have known four times the value of the mesne profits given by a jury in this sort of action of trespass. (24 Mo. 541.) The law of ouster in an action of ejectment between co-tenants, wherein one denies the other ever had title, must be the same

as in an action where there is no such relation. (1 Salkeld, 392; 7 Penn. S. R. p. 400; 3 Shepley, 218; 8 Dana, 163; 9 Dana, 385; 44 Me. 154; 15 N. H. 412; B. Mon. 457; 2 Wm. Black, 1077; 3 Wilson, 118.) The Missouri statutes concerning ejectment would seem to settle this question. (1 R. C. 1855, p. 692, § 13.)

II. The plaintiff's recovery was not defeated by the transfer of the land by Cutter pending suit.

It may be conceded that in the absence of any statutory provision a conveyance of the *locus in quo* pending the suit would prevent a recovery of the land conveyed; such conveyance, however, did not annul the title to the land. The right remained in being and could have been enforced by the assignee in another proceeding. The question, then, of how it was to be enforced was one merely of practice, and was within the scope of legislation. The Legislature provided, by an act approved February 28, 1859, that all suits pending and in the condition of this one " might be prosecuted in the name of the original party." (Sess. Acts of 1858–9, p. 36.) This act has been assailed as unconstitutional. No court has ever, so far as I know, denied to the Legislature the power to change the rules of practice in relation to pending suits. (16 Mo. 68; 10 Wend. 210; 2 Paige, 284; 4 Cow. 384; 11 Paige, 400; Davidson v. Wheeler, 1 Morris, Iowa, 238; also Ballard v. Ridgeley, *Id.* p. 27.) " When the suit in this case was commenced the defendant could have defeated the suit unless plaintiff proved the names of the persons composing the firm, but the statute took away this technicality of the defence." (2 Yeager, 125; Hope v. Johnson, 16 B. Mon. 15; Walston v. Commonwealth, 1 Hempstead, 118; 2 Stewart, 228, anonymous; 1 J. J. Marsh, 563; 12 Smedes & Mars. 347; Bolton et al. v. Johnson et al., 5 Barr. 145; Hunckle v. Riffert, 6 Barr. 196.) In this case the act gave to one of the plaintiffs a recovery in a form which he did not have when the suit was brought.

It is believed that at all times in Missouri ejectment has been the appointed remedy in some classes of titles. (1 R·

C. 1825, p. 343 ; Mitchell v. Tucker, 10 Mo. 260.)   In 1849
the Wells code introduced without objection from the bar the
practice of carrying on suits in certain cases in the name of a
plaintiff who had conveyed his title.   This was the equity
practice.

But it has been objected that the title of the act in ques-
tion being in these words, "An act to amend article eleven
of the act to regulate practice in courts of justice, approved
12th December, 1855," it cannot embrace the present suit,
because said act of December 12, 1855, by section 44 of the
13th article thereof, was prevented from operating on actions
pending when it took effect.   If such a construction should
be placed on it, the act of February 28, 1859, is rendered
null.   The provisions in regard to costs in the act of 1859
were immaterial parts thereof, all courts having all said pow-
ers independent of it.   No court of law or equity would per-
mit any one to use another's name in the incurment of costs
against him without indemnity.   But in fact the title of the
act has nothing to do with this question.   It is no part of the
act, and is never seen or considered except when the words
of a statute are too vague and uncertain to be comprehended
of themselves.   (1 Kent's Com. 460 ; 2 Cranch, 386 ; Bus-
bee's N. C. Law R. 131 ; 1 Md. 351, 370 ; 6 Engl. 44 ; Da-
vie's R. 38, 45 ; 1 Geo. 171 ; 9 Porter, 270 ; 3 McCord, 298 ;
15 John. 89 ; 1 Kent, 461 ; 2 Md. 111 ; 2 Geo. 526 ; 5 Md.
471 ; 2 Bailey, 344.)

III. The defendants were estopped to set up title in Li-
rette, because Lirette was himself estopped to set up title as
against Vifyarenne and his assignee on the facts stated in in-
struction No. 1 of the plaintiff.

It will be seen Lirette conveyed the land in dispute to Vif-
varenne, " guarantying " the same " from all mortgages and
claims generally whatsoever."   This deed was the solemn
contract of Lirette never to disturb the possessor of enjoy-
ment of the property conveyed by Lirette.   This is an ex-
press covenant of non-claim.   (14 Cal. 473.)   The civil law
is the common law of Continental Europe, and of course of

Spain, till shown to be altered by the Cortes or the decrees of Spanish monarchs. (1 Kent, 514.) What, then, was the civil law of sales? Why, that in every sale there is a warranty in consequence of the sale—"*Sive tota res evincatur, sive pars habet regressum emptor in venditorem*"—whether the part or the whole of the thing sold is taken away, the purchaser has his recourse on the seller. (1 Domat. 57, pt. 3 of § 2; 2 Mor. & Carl, Partidas L. 32.) At all times, then, after the sale Lirette was bound not to claim this land against Vifvarenne. Could, then, the defendant set up Lirette's title against the plaintiff when Lirette could not do it? (3 Mo. 40.) By the descent of the land to Louis Vifvarenne and from him to plaintiff's assignors, the covenant of warranty passed to the plaintiff and estopped Lirette from setting up a claim against plaintiff. (Stoddard v. Chambers, 2 How, 316.)

"It is an inflexible rule that where both parties claim under the same person, neither can deny his right, and, as between them, the elder is the better title." (8 Ired. 283.)

IV. The United States survey No. 1479 was conclusive of the true location of the one by forty arpens of land granted to Lirette and by him sold to Vifvarenne. (8 How. 360; 17 How. 403; 18 How. 512; 30 Mo. 202; 28 Mo. 556.)

V. The inventory was not conclusive proof of pedigree. This document was excluded on the first trial. (See 16 Mo. 45.)

"As letters testamentary are evidence of the death of the intestate, there would seem to be no impropriety in permitting the inventory and appraisement under the Spanish law to have that effect."

This is, as far as it is possible to go, "evidence of the death of the intestate;" but this inventory is not letters testamentary on John B. Vifvarenne, nor does it say that he is dead. Taking the whole thing to be true as set forth in the paper, what is it? Why, that Genevieve, wife of the late John B. Vifvarenne, had two children living with her. The inventory is of her property, not Vifvarenne's. The paper should prove her death, not his. But it is used to show she is liv-

ing and he dead. Letters of administration are only *prima facie* evidence of death. They cannot be more. But this is not an inventory of a decedent's effects at all. (See 2 Moreau & Carl, Partidas, 1014, and 1 White's R. 112.)

*A. Todd*, for respondent.

The location of the lot by a survey was the exclusive right of the government, it being confirmed "to be surveyed." It was the government's bounty, and therefore its right to reserve the power of its location. (8 How. U. S. Rep. pp. 345, 363, & 17 How. 403, 413–16.)

The defendants were estopped from denying that Vifvarenne was the owner of the lot when he died, if the jury found the fact to be that the defendants claimed the lot under Vifvarenne. (Jackson, ex. dem. v. Bush, 10 J. R. 223; Jackson, ex. dem. v. Hinman, 10 J. R. 292; Jackson v. Streeter, 5 Cow. 529; Lincoln v. Jackson, 8 Cow. 586; Jackson v. Vosburg, 9 J. R., 270; 27 Mo. 48—see Ins. on p. 49—see pp. 52, 53; Dickson v. Anderson et al., 9 Mo. 155.)

The defendant's cases are not applicable. Landis v. Perkins, 12 Mo., and Blair & Smith, 16 Mo., decide that the grantee holds adversely to his grantor to the extent that he is not estopped from the defence against him under the statute of limitations. Also Macklot v. Dubreuil, 9 Mo. 480. This doctrine is allowed in the case at bar.

The cases of Joeckell v. Easton, 11 Mo., and Sparrow v. Kingman, 1 Comst., 1 N. Y. 242, are cases in which the attempt of the defence was to show that there was no title in the person both sides claimed under. In this case at bar title in Lirette is not denied but affirmed by both sides, and each claim it by deeds shown. Without this defendants appear as mere trespassers, and then they are estopped, as decided in Macklot v. Easton, except as

II. The transfer by plaintiff of his interest in the property sued for during the pending of this suit, did not prevent the same recovery in this action as if he had not made any transfer. To such a case as this the act of the Legislature, ap-

proved February 28, 1859, (Sess. Acts, 1859,) is applicable. It is a rule of construction of statutes that every enactment shall have a real and actual operation, and shall be presumed to have been needed for the purposes indicated in it.

Actions begun under the practice act of 1855 did not need this enactment, for they already had it. (Sec. 34, art. 11, p. 1275, 2 R. C. 1855.) But actions begun before 1848 did need it to enable them to be carried on in the name of the original plaintiff, for a full recovery, after he had transferred an interest in the action. (Sec. 43, art. 13, Practice Act, p. 1293.)

For these actions were governed by the practice at common law and under our ejectment act; at common law by plea in such a case as this. (Stearns on Real Actions, 201 & 206 & 7; § 14 of the act relative to ejectment, p. 693, R. C. 1855; same law, § 15, p. 443, R. C. 1845.)

Besides, had defendants pleaded these conveyances as they should have done, plaintiff might have reinstated himself by getting a reconveyance to him. (1 Tenn. 515.)

DRYDEN, Judge, delivered the opinion of the court.

This was a suit to recover a tract of one by forty arpens of land, situate in the ancient common fields of St. Louis, now within the city limits. The plaintiff recovered a verdict and judgment in the Circuit Court for eleven-fifteenths of the land, and for forty thousand dollars damages, from which the defendants have appealed to this court.

The tract in controversy was confirmed to "Lirette's representatives," by the act of Congress of the 29th of April, 1816.

The plaintiff's case assumes that the origin of the title was a concession to Louis Lirette in 1769, by St. Ange, the French commandant at St. Louis, and to establish title in himself the plaintiff read in evidence:

1. This concession to Louis Lirette, of 1769, of one by forty arpens.

2. Duralde survey of a lot of one by forty arpens for Lirette, executed about the year 1772.

3. An act of sale in 1774, by Louis Lirette to John B. Vifvarenne, of the lot conceded.

4. The confirmation of Recorder Bates to " Lirette's representatives."

5. The official survey of the tract in dispute, made by Réné Paul in 1826, in conformity with the confirmation ; and

6. The deed of certain paternal heirs of Louis Vifvarenne, a son and heir of John B. Vifvarenne, the transferee of Lirette, which the defendants admitted conveyed to the plaintiff eleven-fifteenths of whatever interest in the premises, if any, descended to Louis from his father, John B. Vifvarenne.

The defendants read in evidence a deed dated 11th October, 1817, from Toussaint Marechal and Charles Marechal to Pierre Chouteau, Sen., for the land in controversy, in which the grantors are described as " heirs at law of the late Jacques Marechal and of Madame Vifvarenne, his wife," and by which they convey " all the rights, titles and claims which we (they) have in and to the said piece of land, as heirs of Madame Vifvarenne," and " warranting it free from all donations, debts, dower and mortgages." That the effect the parties expected this deed to have may be the better understood, it is proper to observe that a marriage contract existed between John B. Vifvarenne and his wife, afterwards Madame Marechal, by which it was supposed, in case she survived her husband, she would succeed to one-half of his estate absolutely ; that she did accordingly survive him, and after the death of Vifvarenne she married Jacques Marechal, to whom she bore two sons, the grantors in the Chouteau deed, and then herself died.    Louis Vifvarenne, the half brother of the Marechals, died childless about the year 1813.

The defendants also read a deed of 13th October, 1819, from Pierre Chouteau, Sen., and wife, to John Mullanphy, conveying to the latter two tracts of land, one of which was the tract in dispute.    The deed bounds one of the tracts "on the south by a tract of land formerly granted by the Spanish government to Mr. Louis Lirette, sold by the said Lirette to Mr. Vifvarenne, and by the heirs of said Vifvarenne to us,"

the grantors. The tract in controversy is then conveyed, and is thus described by the deed, viz: " Which last piece of land was originally granted to Mr. Louis Lirette, transferred by him to Mr. Vifvarenne, and which we (the grantors) have acquired from the heirs of said Vifvarènne," and " warranting it, as toward and against ourselves, heirs, administrators or executors, to be free from all debts, dower or mortgages, but without any other guaranty whatever." It was likewise shown that the defendants were the heirs of John Mullanphy, the grantee in the last named deed. The defendants also gave evidence tending to prove that the lot conceded to Lirette and transferred by him to Vifvarenne, was another and different lot from the one confirmed and in dispute, and located five and a quarter arpens south of it.

In this condition of the evidence the court, at the instance of the plaintiff, instructed the jury as follows, viz:

" If the one by forty arpen lot was originally conceded to Lirette and surveyed for him by Spanish authority, as shown by the documents given in evidence ; and if afterwards the concession was transferred by Lirette to John B. Vifvarenne, as shown by the act of sale given in evidence ; and the concession was afterwards confirmed by the act of Congress of 29th April, 1816, and surveyed by the authority of the United States, as shown by the documents given in evidence ; and if the defendants, as the heirs and representatives of John Mullanphy, claim the lot under the deeds they have read in evidence, then the United States official survey No. 1479 is conclusive evidence of the true location of the one by forty arpen lot, and the defendants are estopped from denying that John B. Vifvarenne was the owner of the lot when he died."

The point in dispute, and which this instruction was intended to meet, was, whether the land which was confirmed, and now in suit, was the same tract that was conceded by St. Ange to Lirette and by him transferred to Vifvarenne ; if not the same, as Vifvarenne's title depended upon their identity, and as Vifvarenne's was the only title shown by the plaintiff, the plaintiff was without right.

The question was one of fact for the jury, but the court practically solved it as a question of law, by appeal, 1st, to the conclusive nature of official surveys; and 2d, to the doctrine of estoppel by deed.

It is conceived that the rule which establishes the conclusive effect of a survey executed by the proper authority, has no application to a case like the present. If it was denied that the survey gave the true location of the tract confirmed, the rule might with propriety be invoked, but it is not gainsaid in this case that the survey is in exact conformity with the confirmation. The thing denied is, that the tract confirmed to Lirette is the same that Lirette had before transferred to Vifvarenne. Upon this point the survey of Paul could shed no light, and the court erred in telling the jury it did. It is proper here to remark, that in the certificate accompanying Paul's survey of the confirmation it is stated as a fact that the lot surveyed by him and the lot conceded to Lirette are one and the same. It was no part of the duty of the surveyor to determine the existence or non-existence of this fact, and his statement in regard to it was unauthorized, and therefore incompetent on the question of identity.

As to the doctrine of estoppel. Much and high authority may be found in support of the principle that a vendee is estopped to deny his vendor's title; but the opposite doctrine, established by a series of decisions of this court, has for a long time prevailed in this State, so that it may now be said to be the well settled law of Missouri, that a vendee holding by deed, holds adversely to his vendor, and is not estopped to deny his vendor's title. (Macklot v. Dubreuil, 9 Mo. 473; Joeckel v. Easton, 11 Mo. 118; Landes et al. v. Perkins, 12 Mo. 238; Blair v. Smith, 16 Mo. 273.) The instruction was therefore wrong on the subject of estoppel likewise.

2. On the trial it became a question whether John B. Vifvarenne left two children, or one only, surviving him. That the son Louis survived there was no dispute; but as to a son named François, baptized April 9th, 1782, the same year of the father's death, it was a matter of controversy which died

first, he or the father. The plaintiff gave evidence consisting chiefly of family tradition, tending to show that the child died first; and on the other hand, the defendants, to prove that the child outlived the father, read in evidence an official inventory, made August 19, 1782, of the property belonging " to Genevieve Cardinal, wife of the late John Baptiste Vifvarenne, and to her two younger children living with her," which was subscribed by Gov. Cruzat and witnesses of assistance, among whom was Sans Souci, a brother-in-law of Vifvarenne. A sale was had of the property October 2, 1782. The process verbal of the sale was also subscribed by Cruzat and witnesses, and it describes the property as belonging to Mrs. Vifvarenne and her two children. Sans Souci was a purchaser of several articles at the sale, and subscribed the process verbal. The process was likewise read by the defendants.

The court then, at the instance of the defendants, instructed the jury that " the inventory of the effects and property of Genevieve Cardinal and her two children, read by the defendants, is evidence that at the time it was made there were two sons of J. B. Vifvarenne surviving him." But, by way of qualification, at the plaintiff's instance, further charged the jury that " the inventory and process verbal is not conclusive evidence that John B. Vifvarenne was then dead, or that two of his children were then living, but is a matter to be considered by the jury in determining these questions, together with all the other evidence in the case; and the jury are at liberty, and it is their duty, to give only such weight to it as they shall think it entitled to, and to find these facts as they shall be satisfied in their own minds from all the testimony before them."

The propositions of law embraced in the instructions are, in the abstract, well enough, but under the evidence, as it existed, were not fairly applicable to the case. The instruction carried upon its face a strong implication that there was something suspicious about the inventory and process verbal as instruments of evidence, and that it was the duty

of the jury to receive the facts attested by these documents with distrust. This was unjust. There was nothing in the case to excite the slightest suspicion of the authenticity of the documents themselves, nor was there anything in the facts they attested which was unreasonable or improbable.

The instruments were made by an officer whose duty it was to speak the truth, assisted by others who had opportunities of knowing the truth, and who had no motive to make a false statement of the facts. The necessary operation of the instruction was to lead the jury to under-estimate this evidence.

3. The question affecting the validity of the marriage contract between Vifvarenne and his wife, has twice before, when the case was here, received the consideration of this court. We will leave the question where the decision of our predecessors left it, and suffer that decision to remain the law of the case. (Cutter v. Waddingham et al., 22 Mo. 206.)

4. In the interval between the institution of the suit and the trial of the cause, the plaintiff sold and transferred his interest in the property in controversy to another; and at the trial the plaintiff being thus without title, the defendants objected that he could not recover the land, but only such damages as he had sustained anterior to the transfer. The objection, however, was overruled by the court, and its action in this regard is assigned for error. The objection involves the construction of the act of the 28th of February, 1859, which, by its title, purports to be amendatory of the practice act of 1855.

It is not denied that, if the action had been brought under the law of 1855, the amendatory act would apply to the case and permit the suit still to be prosecuted in the name of the plaintiff; but as it was brought in 1846, before the adoption of the new code of practice, the defendants maintain that the amendatory act does not embrace the case.

The law of 1855, regulating the practice, expressly enacts that its provisions shall *not* apply to actions then pending, but that such actions " shall be conducted to final judgment

in all respects as now provided by law." (R. C. 1855, p. 1293, § 44.)

The following is the act of February 1859, viz: "In case of any transfer heretofore made, or hereafter to be made, of an interest in any action now pending, or hereafter to be brought, other than that occasioned by the death, marriage, or other disability of a party, the action shall be continued in the name of the original party, if the party to whom the transfer is made will indemnify the party in whose name the suit is to be continued against all costs and damages that may be occasioned thereby; or the court may allow the person to whom the transfer is made to be substituted in the action; and in all such cases, the party to whom the transfer is made may be required by the court, upon the application of the party who made the transfer, either to give such indemnity or to cause himself to be substituted in the action, and upon his omission to do so the court shall order the suit to be dismissed." (Sess. Acts 1858-9, p. 36.)

Now, the question is whether the provisions of this act, like those of the act to which it, by its title, purports to be an amendment, are restricted in their application to actions brought under the law of 1855, or whether they embrace as well cases previously brought. There is nothing about the act, except its title, that could raise the slightest doubt as to its universality. It is a remedial statute, and ought to be construed liberally for the suppression of the mischief intended to be remedied. The words of the act are plain and exceedingly comprehensive, embracing "*any* action now pending," without any qualification as to the time when, or the law under which, such action was commenced. This case is within the reason of the act; the same reason which demands the remedy for cases under the new law equally requires its application to those under the old. The title may aid in the construction of a statute when its words are too vague and uncertain to be comprehended of themselves, but in this case there is no such necessity for any such resort. The act establishes a wholesome rule of practice, applicable

alike to all actions, and the instruction asked by the defendants on this point was properly refused.

5. The last point which we are required to pass upon concerns the measure of damage. Proof was given on the part of the plaintiff that if the premises had been free from litigation and had been put to rent, the rents and profits would have amounted to a sum justifying the finding of the jury. On the other hand, it was shown that the rents and profits actually received by the defendants did not exceed the public charges. Upon this evidence the defendants asked the court to instruct the jury " that if they found that at the commencement of the suit the plaintiff and defendants were respectively entitled to undivided interests in the lot in controversy, then the jury should find for damages no more than the proportional share of the plaintiff, of the rents and profits *actually derived* by the defendants from said premises." The court refused the instruction, and its refusal is assigned for error.

Generally, the actual annual value of the property detained, with interest thereon, is the measure of damage in ejectment ; and we find no authority to sustain the proposition that the case of tenants in common forms an exception to the general rule.

The fact that the land is held by the owners in undivided interests in any case may very well tend to diminish the annual value, and reduce it below what it would be, if the land was held in severalty ; and it is a circumstance which the jury may well consider in determining the question what the annual value is. It however in nowise infringes the rule. The court committed no error in refusing the instruction. For the giving of the first and fifth instructions for the plaintiff, the judgment of the Circuit Court must be reversed, and with the concurrence of Judge Bates it is reversed and remanded.

Judge Bay having been of counsel, did not sit in this case.

Judge BATES. In my opinion, after the plaintiff Cutter had conveyed away the land, he could not recover the possession of it in this suit.