CUMMINGS *et al., Appellants,* v. POWELL.

1. **Public Lands:** COMMON-FIELD LOTS OF ST. LOUIS: ACT OF CONGRESS OF JUNE 13, 1812. Lands forming a part of the Grand Prairie Common-Field lots of St. Louis, inhabited, cultivated or possessed by the inhabitants thereof prior to December 20, 1803, were, by the act of congress of June 13, 1812 ( 2 U. S. Stat. 748 ), confirmed to such inhabitants ; and such as were not rightfully owned or claimed by private individuals, were reserved for the use of the schools, and were not subject to the location of New Madrid certificates, under the act of February 17, 1815 ( 3 U. S. Stat. 211 ), allowing the location of such certificates upon land authorized by law to be sold.

2. ——: ——: ——. Said act declared how the survey authorized by it should be made, and that it should include the common-field lots ; such lots were monuments by which the surveyor should have been guided. and he had no discretion to omit them, or any of them, as the act segregated them from the public domain.

3. ——: —— : ——. Although the act set apart to the schools only one-twentieth part of the land included in the general survey and contemplated a possible surplus, yet all the unclaimed common-field lots were reserved in order that the schools might get their proper amount, and they were not subject to the location of New Madrid certificates prior to 1840, when a survey of them was made.

4. ——: ——: ACTS OF JUNE 15, 1864, AND JUNE 30, 1864. The act of June 15, 1864, granted all lots and parcels of land in the Grand Prairie Common Field, in township 45, range 7, east, not before disposed of, to the state for the support of schools in said township, and a survey was not necessary to give it effect; and the subsequent act of June 30, 1864, relinquishing the title of the United States in and to all lands within the boundaries of designated locations in the same township and range, made by certificates issued under the New Madrid act to the representatives in whose names the locations were made, did not validate the previous location of a New Madrid certificate upon the lands in the township, both acts providing that nothing contained in them should impair, prejudice, or injure any adverse right, title or interest of any person or persons in or to any of the lots or tracts conveyed.

5. **Vendor and Vendee:** OUTSTANDING TITLE OF VENDOR: ESTOPPEL. Where the relation of a defendant in an action of ejectment is only that of vendor to vendee to the ancestors of the plaintiff, he is not estopped from disputing their title. He may set up the statute of limitations, as against the vendor, or an outstanding title, and may show that the vendor had no title.

6. ——: ——: ——: EJECTMENT. When both parties claim title from the same grantor, nothing more appearing, the title in the common grantor will be taken as admitted. But this rule does not prevent the defendant in ejectment from showing that plaintiff had no title; but he cannot, at the same time, claim part of the lands under and part against the same title.

7. **Limitations.** The statute of limitations does not begin to run before the title to the land emanates from the United States.

*Appeal from St. Louis Court of Appeals.*

REVERSED AND REMANDED.

*D. T. Jewett* for appellants.

(1) Where both parties claim under the same person, that person's title is admitted. (2) The location of the New Madrid certificate in 1822 was lawfully made on land subject to such location, and thereby the equitable title to said land became vested in James Conway's heirs and legal representatives, and can only be defeated by the owner of an earlier and superior title under the

government vested in the defendant. (3) Neither the trial court nor this court is authorized to say where the out-boundary line provided for in the first section of act of June, 1812, should or should not have been run; and there is no reservation for the schools, nor ever was, outside of the said out-boundary as run by the land department of the United States, and the schools have no title anywhere, nor ever had, until a survey is made for them by the United States Land Department. *Carondelet v. St. Louis*, 1 Black, 189; *Dredge v. Forsyth*, 2 Black, 569; *Bryan v. Forsyth*, 19 How. 338; *Papin v. Ryan*, 32 Mo. 21. (4) As plaintiffs claim under two acts of congress, the New Madrid act of 1815 and the act of June 30, 1864, they have a title in fee which cannot be disputed by the defendant unless he can show title from the government to the same property. Plaintiffs claim under acts of congress, stronger than patents. *Whitney v. Morrow*, 112 U. S. 695. (5) Defendant has not set up any title in him as coming from the government except under the same acts of congress by which plaintiffs claim, and under the same man the plaintiffs claim. He cannot claim under one title and then dispute it. *Fugate v. Pierce*, 49 Mo. 449; *Brown v. Brown*, 45 Mo. 412; *Rumfelt v. O'Brien*, 57 Mo. 569. (6) The statute of limitations had not run ten years after the fee was granted by the act of June 30, 1864, before referred to, before this suit was brought; and for that reason the eighth instruction should not have been given. (7) In order to locate a common-field lot by testimony in court, it must be established by evidence in court that some particular person, known and named, cultivated or occupied some particular lot, with as certain boundaries and limits, before December 20, 1803; that such person was then an inhabitant of the village of St. Louis, and that he, or some one under him, claimed the same lot in 1812. It will not do to prove that a broad expanse of ground

was generally cultivated or occupied by somebody. (8) The act of June 15, 1864, is wholly worthless as a defense to this suit.

*Martin, Laughlin & Kern* for respondent.

(1) The land sued for was not open to location under a New Madrid certificate, such as plaintiffs claim in their behalf. *Glasgow v. Baker*, 85 Mo. 559. (2) The land sued for is within the out-boundaries of the Grand Prairie Common Fields of St. Louis. This fact does not disprove its connection with the Grand Prairie Fields. *Glasgow v. Horitz*, 1 Black, 602. (3) These common-field lots, being necessarily reserved from sale by the Act of June 13, 1812, were exempt from location and disposition under and by virtue of the New Madrid certificate through which the plaintiffs claim. *Stoddard v. Chambers*, 2 How. 284; *Martin v. Nebraska*, 21 Wall. 660. (4) If the lands were vacant or unclaimed field lots, within the meaning of the act of 1812, legally or equitably belonging to the United States, they were effectually disposed of by the act of June 15, 1864, and therefore, nothing was left of them for the act of June 30, 1864, to take effect upon, as a new appropriation or disposition. (5) The doctrine of estoppel, as between vendor and vendee, has never been accepted, but has been repeatedly denied in this state. The relation between vendor and vendee is hostile and antagonistic. That is the primary implication of the law. If an estoppel arises, it must come from circumstances and considerations which exist outside of the relation. In ejectment, when the defendant claims title from no other source than the plaintiff, or a common grantor of both, and the two titles are identical in the plaintiff or common grantor, he may well be estopped from denying the validity of the plaintiff's title. In every other case he is at liberty to dispute the plaintiff's title, however much of it he may have bought in. *Macklot v. Dubreuil*, 9 Mo. 473; *Lander v. Perkins*, 12 Mo. 238; *Blair*

*v. Smith*, 16 Mo. 273 ; *Cutter v. Waddingham*, 33 Mo.
269 ; *Mattison v. Ausmuss*, 50 Mo. 551 ; *Wilcox v. Osborn*
77 Mo. 621. (6) Instruction number eight, given for
defendant, was intended to apply in the event the court
should hold that the certificate, under which plaintiffs
claim, was properly located on the land in suit, and
need not be considered, if the court adheres to the con-
clusions announced in *Glasgow v. Baker*, *supra*, that
the land in controversy was reserved from sale, and that
the plaintiffs' location was void. (7) It was not
intended by the act of 1831 to dispense with the survey
and designation by the officers of the government, which
was required by the act of May 26, 1824. *Hammond v.
Schools*, 8 Mo. 65 ; *Kissell v. Schools*, 16 Mo. 553 ;
*Papin v. Ryan*, 32 Mo. 21 ; *Kissell v. Schools*, 18 How.
[U. S.] 19 ; *Public Schools v. Walker*, 9 Wall. 282.
(8) The grant under the act of June 30, 1864, is a gen-
eral relinquishment or quit-claim of the government
title to all lots within the Grand Prarie Common Fields.
This would be sufficient description between citizens.
It is unquestionably definite enough for a grant by a
government. *Bank v. Bates*, 17 Mo. 583 ; *Long v. Hig-
ginbottom*, 56 Mo. 245 ; *Cornwell v. Thurston*, 59 Mo.
156 ; *San Francisco v. Irwin*, 28 Fed. Rep. 708.

BLACK, J.—The plaintiffs commenced this action of
ejectment on the twenty-second of June, 1874, to recover
a part of lot 38, in Peter Lindell's second addition to St.
Louis. For title, they read in evidence New Madrid
certificate No. 348, issued to James Conway or his legal
representatives on the twentieth of November, 1817, for
two hundred arpents of land ; a location of this certifi-
cate on June 6, 1818 ; survey No. 2712, dated the twenty-
third of June, 1819, which survey was returned to the
recorder of land titles on the fourth of September, 1822 ;
a certificate for a patent, but upon which certificate no
patent was ever issued ; and the act of congress of June
30, 1864. (13 U. S. Stat. 581). This survey, No. 2712, is

called the Conway location and the property in suit is within its boundaries.

The evidence shows that James Conway died about the year 1810, leaving as his heirs his father, William Conway, and three sisters, namely, Nancy, Polly and Jane or Janet. The plaintiffs in this suit are the descendants of these three sisters, except Smith, who claims some interest through the other plaintiffs. It seems to be conceded that William Conway inherited a life estate only from his deceased son. And as William died about the year 1840, long before the commencement of this suit, it is not essential to notice the various deeds from and under him read in evidence by the defendant.

During the trial, the defendant read in evidence three deeds, one from each of the three sisters of James Conway, to Joseph Harding, dated in the years, 1823 and 1825, and a deed from the Public Schools to Peter Lindell, dated August 20, 1845, purporting to convey much property of which the property in question is a part. It was admitted that defendant had all the title formerly possessed by Peter Lindell and Joseph Harding. The deed from the schools to Lindell is not relied upon as giving to Lindell a good title, and two of the deeds from the sisters of James Conway proved to be of no avail to the defendant. When Nancy executed the deed to Harding she had a husband living who did not join therein, and while Polly and her husband both signed the deed to Harding, still it was not acknowledged, simply proved up by subscribing witnesses, and for these reasons these deeds proved to be of no avail to defendant. Indeed, the plaintiffs insist that the deed from Jane or Janet to Harding is also invalid. She married Hicks, from whom she had been divorced, and the claim is that the decree is void, and since he did not join her in the deed, that it is of no validity.

The defendant put in much other evidence which

tends strongly to show that the parcel of property now in suit lies within the Grand Prairie Common Field. The Bizet lot lies to the north and the Lacroix lot to the south, and both of these common-field lots are identified by United States surveys. Between these two common-field lots there are five others which are not identified by United States surveys, but the evidence tends to show that they were all occupied or cultivated prior to December 20, 1803. These five lots do not appear to have ever been claimed by individuals under the act of congress of June 13, 1812. The land in suit is a part of two of these five lots. The defendant and those from whom he claims have been in actual possession of the land in suit for more than forty years before the commencement of this suit.

From the foregoing statement, it will be seen that the plaintiffs claim title from James Conway, under the New Madrid location. The defendant sets up title under the same location, but as some of his deeds proved to be of no avail for the purpose of making title, he takes the ground that the location was invalid, and for this reason the plaintiffs have no title and cannot recover. The third instruction given at his request is, in substance, that if the land in suit is a part of common-field lots in the Grand Prairie Common Field, that these common-field lots were used by many of the inhabitants of the town of St. Louis, prior to December 20, 1803, for the purpose of cultivation, then it was not subject to the location of a New Madrid certificate, and the location and survey is void ; and on this state of facts, the sixth instruction draws the further conclusion that by the act of congress of June 15, 1864, the title to the common-field lots, not before disposed of by the United States by confirmation and survey, or otherwise, passed to this state for school purposes. These instructions present the most important question in the case.

The act of February 17, 1815, (3 U. S. Stat. p. 211),

for the relief of inhabitants of New Madrid county, who suffered from earthquake, authorized persons owning injured lands to locate a like quantity on any of the public lands, the sale of which was authorized by law. It is clear that under this act, the New Madrid certificate could only be located on land subject to sale. That act, in this respect, is not modified by the subsequent acts of April 9, 1818, or April 26, 1822. The question then is, whether these common-field lots were reserved from sale by the act of congress of June 13, 1812. (2 U. S. Statutes, 748). In the recent case of *Glasgow v. Baker*, 85 Mo. 559, we held that the sixth section of the act of March 6, 1820, which provides that section 16 in every township, and when such section has been sold, or otherwise disposed of, other lands equivalent thereto, shall be granted to the state for the use of schools, did not and was not intended to invade these common-field lots, because the previous act of June 13, 1812, had disposed of them. The judgment of this court in that case has since been affirmed by the supreme court of the United States. (128 U. S. 560.) The rulings in that case go far to show that these common-field lots were not open to sale, and therefore not open to the location of a New Madrid certificate under the act of February 17, 1815. The defendant in that case set up title under, and also an outstanding title in, individual confirmees under the act of 1812. But in the present case it seems that the five Grand Prairie Common-Field lots have never been claimed by individuals, and this gives to the question a new aspect.

The first section of the act of 1812, enacts: "That the rights, titles and claims to town or village lots, outlots, common-field lots and commons, in, adjoining and belonging to the several towns of (St. Louis being named) which lots have been inhabited, cultivated or possessed, prior to the twentieth of December, 1803, shall be, and the same are hereby confirmed to the

inhabitants of the respective towns or villages aforesaid, according to their several right or rights in common thereto." It is then made the duty of the deputy surveyor, as soon as may be, to survey the out-boundary line of the village, "so as to include the out-lots, common-field lots and commons," thereto belonging. The second section provides: "That all town or village lots, out-lots, or common-field lots, included in such surveys, which are not rightfully owned or claimed by any private individuals, or held as commons belonging to such towns or villages, or that the President of the United States may not think proper to reserve for military purposes, shall be, and the same are hereby reserved for the support of schools in the respective towns or villages;" the proviso is that the whole quantity of land contained in the lots reserved for schools in any town, shall not exceed one-twentieth part of the whole lands included in the general survey of such town. As to the common-field lots which were thus confirmed to individuals, no patent is required to vest the title in the individual owner. This is true though the lot may not be included in the out-boundary survey as it was finally made in the year 1840. *Glasgow v. Lindell's Heirs*, 50 Mo. 60; *Glasgow v. Hortiz*, 1 Black, 599.

The theory of the act is, and the proof in all of these cases shows, that these common-field lots had an existence in point of fact at the date of the act. A survey would aid in identifying them, but they were previously defined and located on the face of the earth. It required no new survey to bring them into existence. The second section of the act contemplates that there may or will be common-field lots not claimed by individuals, and these are reserved for school purposes, subject to the limitation as to the quantity going to the schools. While this second section reserves only such property as shall be included in the survey of the outboundary, the first section declares how that survey

shall be made. It must run so as to include the
common-field lots.   They were monuments by which
the surveyor should have been guided.   No discretion
was vested in him to omit them, or any of them, for the
statute segregated them from the public domain.   The
act undertakes to dispose of all of the common-field
lots, those owned and claimed by individuals go to them
in fee, those not owned or claimed by individuals are
just as clearly reserved for the designated purposes.   It
is true the schools were to get a quantity not to exceed
the one-twentieth part of the land included in the
general survey, and here it may be said that the act
contemplates a possible surplus.   But a continued
reservation of all of the common-field lots was necessary
in order that the schools might get their proper amount.
We find nothing in the act of May 26, 1824, or the act
of January 27, 1831, that opens up any of these
unclaimed lots to sale.

The parcels going to the schools had not, at the
date of the last-named act, been set off to the schools,
and hence it has been held that the title did not attach
in favor of the schools to any particular parcel until set
off and designated as the property of the schools.
*Papin v. Ryan,* 32 Mo. 21 ; *Kissell v. St. Louis Public
Schools,* 18 How. 21.   But this difference between the
time of the vesting of the title in individuals under the
first section, and the vesting of title in the schools
under the second section, argues nothing against the
proposition that these lots were reserved from sale and
hence from the location of a New Madrid certificate.   It
is said in *Shepley v. Cowan,* 91 U. S. 336 :   " A sale is
as much prohibited by a law of congress, when to allow
it would defeat the object of the law, as though the
inhibition were in direct terms declared."   Here the
reservation of unclaimed common-field lots is not only
express, but the object of the law would be defeated to
hold them open to sale.

The difficulty which arises in this and like cases is that the surveyor did not run the out-boundary survey until 1840, and he then run it so as to exclude the Grand Prairie Common Field, and hence excluded the land in suit. In the meantime this New Madrid certifi-cate had been located, wholly, it is said, upon these claimed and unclaimed common-field lots. As to the lots owned by individual confirmees under the act of 1812, the location of the New Madrid certificate is void. But authorities are cited to show that as the schools accepted this incorrect out-boundary, it became conclu-sive as between them and the United States. Let this be conceded, yet if we are correct in what has been said, there was no time from 1812 to 1840, when these unclaimed common-field lots were open to sale or the location of a New Madrid certificate. All of the acts done in the way of locating this Conway claim and in procuring the patent certificate, were done before the last-named date, and it is to be remembered that no patent was ever issued. It is difficult to see how the subsequent erroneous survey could give any validity to the previously unlawful location. We can but conclude that this location of the New Madrid certificate is invalid, as to the unclaimed common-field lots, and that the plaintiffs have no title, lest it be shown that the United States have made the location valid by some act done since 1840.

This conclusion it is argued is contrary to former adjudications of this court and the supreme court of the United States. From the concluding remarks in *Gibson v. Chouteau,* 39 Mo. 570, and *Kissel v. St. Louis Public Schools,* 18 How. 28, it is clear that neither this nor that court expressed any opinion as to the effect of the erroneous survey of 1840, upon titles to land outside of that survey, and which should have been included. The other cases do not appear to have any direct bearing upon the question in hand.

This brings us to the acts of congress of June 15, 1864, and of June 30, 1864 (13 U. S. Stat. pp. 132, 581). The first enacts that all of the right, title and interest of the United States in and to all lots and parcels of land in the Grand Prairie Common Field, in township 45, range 7, east, which have not been before disposed of shall be and are granted and relinquished to this state for the support of schools in said township. The other act provides that all the right, title, etc., of the United States in and to all lands within the boundaries of designated locations in the same township and range made by certificates issued under the New Madrid act shall be and are relinquished to the representatives of the persons in whose names the locations were made. This Conway location is clearly described as one of the locations. Both acts have provisos by which it is declared that nothing in the act shall impair, prejudice or injure any adverse right, title or interest of any person or persons in or to any of the lots or tracts of land conveyed. If this last act stood alone, then it might well be held that it made valid the Conway location as to abandoned or unclaimed common-field lots, but the other act is the prior one and the property conveyed is limited to lots and parcels of land in the Grand Prairie Common Field. The reason assigned here why the first act must not prevail, as to the property in the Grand Prairie Common Field, is, that the act describes nothing, and provides for no survey of the land which it undertakes to grant. There was no need of any survey, for, as before stated, the common field and the lots therein had an existence without a new survey. It may be difficult at this late day to trace the boundaries, but that fact cannot make the act void. The act of 1812 did take effect without a survey as to the lots confirmed to individuals, and so may this act take effect without a survey. The property previously disposed of by the United States, being determined, the act takes

effect upon the residue. It follows that upon the facts hypothetically stated in the defendant's instructions, the plaintiffs have no title to the property in dispute.

It is insisted that as the defendant put in evidence the deeds from the plaintiffs' ancestors, he is estopped from disputing their title. There is in this case no relation of landlord and tenant, nor is defendant in possession under an unexecuted contract for the purchase of the land, nor is he in possession under one whose land has been sold on execution. The relation of defendant to plaintiffs' ancestors is no more than that of vendor to vendee. In such cases, the vendee holds adversely to the vendor. He may set up the statute of limitations as against the vendor, on outstanding title, and may buy up as many titles as he likes; *Macklot v. Dubreuil*, 9 Mo. 478; *Landes v. Perkins*, 12 Mo. 238; *Cutter v. Waddingham*, 33 Mo. 269; *Mattison v. Ausmuss*, 50 Mo 551; *Wilcox v. Osborn*, 77 Mo. 621; and as a consequence, show that the vendor had no title.

When both parties claim title from the same grantor, nothing more appearing, the title in the common grantor will be taken as admitted. *Fowler v. Wise*, 49 Mo. 350; *Holland v. Adair*, 55 Mo. 40. But this rule does not prevent the defendant, in ejectment, from showing that the plaintiff had no title. The defendant in this case could not nor does he claim that the proof which defeats the plaintiffs is to be applied as to the two-thirds for which the deeds failed and not to the other third, the Janet Hicks' interest. He cannot at the same time claim part under and part against the very same title. The cases of *Chouquette v. Barada*, 33 Mo. 249, and *Fugate v. Pierce*, 49 Mo. 449, go no further, and are not in conflict with the rule before stated.

We see nothing to take this case out of the rule that plaintiffs must recover, if at all, on the strength of their own title. It is a proper case for its application,

and especially in view of the fact that defendant has been in possession for such a long time.

The defendant's eighth instruction is based upon the theory that the statute of limitations began to run before the title to the land emanated from the United States. We understand *Gibson v. Chouteau,* 13 Wall. 92, to plainly establish a different rule, as we have said on several occasions. *Hammond v. Johnston,* 93 Mo. 222, and cas. cit. It is not conceded here, as was the case in *Glasgow v. Baker, supra,* that the property in suit is a part of a common-field lot. If that was the case here we should affirm the judgment. It may be the court found for defendant on this eighth instruction, for it is complete in and of itself, and for the error in giving it the judgment is reversed and the cause remanded, but for no other reason. BARCLAY, J., not sitting, the other judges concur.