STATE ex rel. UTILITY CONSUMERS COUNCIL OF MISSOURI, INC., Petitioner-Appellant,

and

William M. Barvick, Public Counsel, Intervenor-Appellant,

v.

PUBLIC SERVICE COMMISSION of Missouri and Union Electric Company, et al., Respondents.

STATE ex rel. William M. BARVICK, Public Counsel, Appellant,

and

Kansas City, Missouri, Intervenor-Relator,

v.

PUBLIC SERVICE COMMISSION of Missouri, Respondent,

and

Arkansas-Missouri Power Company, Empire District Electric Company, Kansas City Power & Light Company, Missouri Edison Company, Missouri Power & Light Company, Missouri Public Service Company, Missouri Utilities Company, St. Joseph Light & Power Company, Union Electric Company, and Armco Steel Corporation, Intervenor-Respondents.

No. 60848.

Supreme Court of Missouri, En Banc.

June 29, 1979.

Rehearings Denied Sept. 11, 1979.

**44**

William M. Barvick, Gregory J. Christoffel, Jefferson City, for intervenor-appellant.

Samuel H. Liberman, Washington University School of Law, Lindell & Skinker, St. Louis, for petitioner-appellant.

Paul W. Phillips, Asst. Gen. Counsel, Robert L. Hawkins and James C. Swearengen, Jefferson City, Stewart W. Smith and William E. Jaudes, Union Elec. Co., August L. Griesedieck, St. Louis, for respondents.

SEILER, Judge.

This case, transferred from the court of appeals, Kansas City district, prior to opinion pursuant to rule 83.06, concerns the lawfulness and reasonableness of the Public Service Commission's (PSC) report and order in cause No. 17,730. In that order it authorized the use of an automatic fuel adjustment clause for recovery of fuel costs by electric utilities which were subject to its jurisdiction. It also authorized a roll-in to basic rates of amounts collected under a prior fuel adjustment clause, and a surcharge of fuel costs incurred by the utilities during the period in which the prior clause was effective but which were not collectible under the terms of that clause, before it was superseded. Appellants Utility Consumers' Council of Missouri, Inc., and William M. Barvick, public counsel, separately intervened in the proceedings below. Both filed motions for rehearing which were denied and both appealed the decision and order of the commission to the circuit court of Cole County by petition for writ of review, as authorized by § 386.510, RSMo 1969. The circuit court affirmed the order and decision of the commission. The appeals have been consolidated. We reverse and remand.

This proceeding has a rather long history. On March 19, 1973 the commission entered an order of investigation in case No. 17,730 in order to investigate the fuel adjustment clause method of recovery of fuel costs by electric utilities within its jurisdiction. A fuel adjustment clause is a clause, filed as a part of an electric utility's tariff, which allows it automatically to increase or decrease the charge for power per kilowatt-hour to consumers by the amount of an increase or decrease in the utility's fuel costs, usually on a monthly basis. Such a clause had never before been permitted to become a part of a residential rate schedule in Missouri, although it has been permitted as a part of industrial and large commercial rate schedules, a matter which is not before us in this case. The courts of this state have never before passed on the validity of such a clause. The commission held hearings in the summer of 1973, and on February 1, 1974 issued a report and order giving temporary authorization for application of a fuel adjustment clause (FAC) to all sales of electricity for a two year period. On September 12, 1975 the commission began review of the operation of the FAC, as a continuation of case No. 17,730. It gath-

ered information from the utilities as to their experience with the clause, held hearings in February 1976 at which over 1,800 pages of testimony were heard, and received numerous filings of briefs and exhibits. The 1974 order was extended until April 15, 1976. On April 14, 1976 the commission, by a three to two decision, entered its report and order authorizing continued use of a modified FAC. The effectiveness of the original FAC was extended to May 31, 1976, and the new FAC was permitted to become effective on billings commencing June 1, 1976, and was made effective until May 31, 1978. We understand the FAC was extended by order of the commission until either decision of this court in this case or December 31, 1978, whichever was earlier, and was again extended by order of the commission until such time as the commission had ruled on the appropriate amount of the utilities' annual fuel adjustment, which has not yet occurred. In any case, the cause is not moot because of the continuing importance of the question whether an automatic fuel adjustment charge is authorized in light of the fact, of which we take notice, that a fuel adjustment charge is still a part of customer bills and the question of authorization for its use will recur, yet could evade judicial review, *State ex rel. Laclede Gas Co. v. Public Service Comm'n*, 535 S.W.2d 561, 565 (Mo.App.1976).

I. The Fuel Adjustment Clause

In its 1974 report and order the commission reviewed the statutory authority for authorization of an FAC, basically relying on *Hotel Continental v. Burton*, 334 S.W.2d 75 (Mo.1960) and § 393.130(4), RSMo 1969, discussed *infra*.[1] By its order it authorized recovery of fuel adjustment costs in two parts, the basic fuel recovery cost, and a fuel adjustment charge for changes up or down in the cost of fuel from the base cost previously set by the commission.

Basically, the 1974 fuel adjustment formula authorized by the commission permitted the utility to file an FAC as part of its tariff schedule. The FAC permitted the company to determine its actual fuel cost and actual sales in any given month. Any change in fuel cost was converted into a change in cost per kilowatt-hour of power sold by applying a formula which arrived at the average number of BTU's of heat necessary to generate one kilowatt-hour of electricity. Certain technical adjustments were made, and a figure equal to the fuel adjustment charge (i. e., the increased or decreased cost of fuel over the base fuel cost) was determined. Thirty days notice was given to the commission and the adjustment then was included on consumers' bills. Because of the 60–120 day lag-time (each utility's lag varied depending on its practices), required to gather the figures necessary to compute the FAC charge, and the notice requirement, changes in fuel costs in, for example, October were added to the bills for the December 16 to January 15 meter readings. Certain safeguards, such as a requirement that information relevant to a determination of whether fuel costs in fact increased be given the commission, were ordered.

As a result of this rather inexact method, which involved charging customers in January for fuel costs incurred in October and apportioned according to the number of kilowatt-hours sold in October, the utility overrecovered its full costs if the number of kilowatt-hours sold in January were greater than in October, and underrecovered if they were less.

In its 1976 order, the commission modified the fuel adjustment clause it had previously approved. It set forth a model tariff indicating how the new FAC was to be filed. Substantial compliance with this tariff was required of any utility which wished to utilize a fuel adjustment clause. The 1976 order permitted recovery only of coal costs. In order to eliminate the possibility of under or over recovery because of a switch in the source of fuel, possible under the old clause, the heat-rate based formula was replaced by a formula permitting dollar for dollar recovery of fuel costs above or below the base fuel cost. This formula also

1. Further statutory references are to RSMo 1969 unless otherwise indicated.

permitted recovery of the cost of the fuel component of power purchased from other sources rather than generated by the utility.

Under the new formula, the utility was still required to determine actual, rather than estimated, fuel cost changes for the month in which an increase in costs occurred, but was allowed to use estimated figures for projected sales for the month in which increased charges based on the changed fuel costs would be billed. Once actual sales became known a correction factor would be included in a later month's billing. Further, the 30-day notice period was eliminated. In this way, part of the regulatory lag between incurring the costs and passing them on to the consumer was eliminated. Certain safeguards, including monthly reports to the commission and an annual audit by the commission, were required.

As an example of the operation of the 1976 FAC authorized by the commission, assume that fuel costs have risen in January. Once actual costs for that fuel are known, the utility will submit them to the commission. It will also submit its estimated sales in March and the resulting fuel adjustment charge to be used in the March billing. The staff will have the balance of the month of February to check these figures. In March, an increased fuel adjustment charge will take effect. During April, the utility will determine the difference between its actual March sales and the estimated sales used to figure the March charge. A correction factor will be figured to adjust for any inaccuracy, and will be included in figuring the May fuel charge. The same procedure would be followed each month, so that February's costs would be figured in March and applied to April estimated sales, actual April sales would be figured in May and a correction factor be included in the June billing, and so forth.

The PSC also raised the base fuel cost for each utility filing an FAC to include the annualized cost of fuel for the 12 month period preceding the commission order. This is called a "roll-in" of fuel costs. Basically, the costs previously included in the FAC became a part of the base cost, which consequently rose by that amount. The fuel adjustment charge was thus temporarily zero, and any new charge because of increased fuel cost was thus figured from the higher base cost.

## II. The Surcharge

The commission also ordered that any "uncollected fuel adjustment revenues as of April 30, 1976" caused by the lag under the 1974 clause would be collected, over a period of not less than twelve months, under a surcharge collection plan to be submitted by each utility.

The surcharge was designed to recover fuel cost increases incurred up to April 30, 1976 for which increases in fuel adjustment charges to the customer had not been made because (as a result of the lag required by the 1974 order), these charges were not collectible under the procedures prescribed in the 1974 order before that order expired on May 31, 1976. These charges were also not permitted to be collected under the FAC approved on April 14, 1976, which only became effective for billings commencing June 1, 1976.

Two dissenting opinions were filed. Commissioner Fain pointed out that the FAC had been initially approved only on a temporary basis, and concluded that it was not very useful as a regulatory tool, particularly in that it had not substantially lessened the commission's caseload. He also stated that permitting use of the FAC to cover out-of-state purchased power was undesirable because it is difficult to police purchases from outside the commission's jurisdiction. He did note that commendable additional safeguards had been added. Commissioner Mulvaney also dissented. Although feeling the clause was greatly strengthened, he believed policing difficulties and general confusion over it required its elimination.

## III. Issues Raised

A number of issues are raised on appeal of this case. They may be divided into four general arguments against authorization of

the FAC. First, it is argued that there is simply no statutory authority for use of an automatic adjustment clause at all. Second, even if such statutory authority is found, the PSC can only authorize an FAC in a contested case, and not by rule applicable to the industry as a whole, as it is claimed was done here. Third, even if the rule method is appropriate, the requirements for findings of fact and other procedures required under chapter 386 were not followed. Fourth, in any case the surcharge is unlawful as retroactive ratemaking in order to recover for past losses.

■ On appeal, our role is to determine whether the commission's report and order was lawful and, if so, whether it was reasonable, *State ex rel. Dyer v. Public Service Comm'n*, 341 S.W.2d 795, 802 (Mo.1960), *cert. denied*, 366 U.S. 924, 81 S.Ct. 1351, 6 L.Ed.2d 384 (1961).

■ The commission order has a presumption of validity and the burden is on those attacking it to prove its invalidity. *Id.* at 800; *State ex rel. St. Louis-San Francisco R. Co. v. Public Service Comm'n*, 439 S.W.2d 556, 559–60 (Mo.App.1969). In determining the statutory authorization for, or lawfulness of, the order we need not defer to the commission, which has no authority to declare or enforce principles of law or equity, *Bd. of Public Works of Rolla v. Sho-Me Power Corp.*, 362 Mo. 730, 244 S.W.2d 55 (banc 1952). However, as to matters of reasonableness we cannot substitute our judgment for that of the commission if it is supported by substantial and competent evidence on the record as a whole, *State ex rel. National Trailer Convoy, Inc. v. Public Service Comm'n*, 488 S.W.2d 942, 944 (Mo.App.1972).

We have concluded that application of an FAC to residential and small commercial customers, as was done in this case, was beyond the statutory authority of the commission and that the FAC, roll-in, and surcharge were therefore unauthorized and cannot continue in effect. The question of use of an FAC in regard to other customers is not an issue in this case. Because of our resolution of the question of statutory au-

thorization for an FAC, we do not reach the second and third issues raised.

## IV. General Powers of Public Service Commission

The first Public Service Commission law was enacted in 1913, S.B. 1, 1913 Mo.Laws, §§ 1–140, at 556. This court has previously recognized that its purpose was to protect the consumer against the natural monopoly of a public utility, as provider of a public necessity, *May Dep't Stores Co. v. Union Electric Light & Power Co.*, 341 Mo. 299, 107 S.W.2d 41, 48 (1937), while at the same time permitting a recovery by the utility of a just and reasonable return.

"Prior to its enactment the only protection to consumers as to rates and service was their right to make the best contract they could with utilities in competition with each other for their business. This law was the result of growing feeling that such competition, as existed in this field, was inadequate to protect the public. It provided, in lieu of competition and the right of private bargaining, impartial treatment of every one under regulations approved and enforced by the state. . . . This court also said that the Public Service Law recognized 'certain generally accepted economic principles and conditions, to wit, that a public utility . . . is in its nature a monopoly; that competition is inadequate to protect the public, and, if it exists, is likely to become an economic waste; that state regulation takes the place of and stands for competition; that such regulation, to command respect from patron or utility owner, must be in the name of the overlord, the state, and to be effective must possess the power of intelligent visitation and the plenary supervision of every business feature to be finally (however invisibly) reflected in rates and quality of service.'" *May Dep't Stores v. Union Electric Power and Light Co.*, 107 S.W.2d at 48, quoting *State ex rel. City of Sedalia v. Public Service Comm'n*, 275 Mo. 291, 204 S.W. 497, 498 (Mo.1918), *appeal dismissed* 251 U.S. 547, 40 S.Ct. 342, 64 L.Ed. 408 (1920).

In pursuance of these policy objectives, Chapter 386 authorizes a public service commission and Chapter 393 sets forth rules for its regulation of electric, gas, sewer, etc. corporations. The commission is given jurisdiction over the manufacture, sale and distribution of electricity, §§ 386.250(5), 393.140, RSMo 1969. This includes the power to supervise, among other things, the quality of production and of service; to order improvements and to set standards; to investigate the methods and inspect the facilities of the utilities; and to require the filing of a verified annual report on the financial situation and physical condition of the company, etc. Section 393.140. The commission also has the power to require all electric companies to "file with the commission and to print and keep open to public inspection schedules showing all rates and charges made, established or enforced or to be charged or enforced, all forms of contract or agreement and all rules and regulations relating to rates, charges and service used or to be used . . . ." § 393.140(11). No change shall be made without 30 days notice and 30 days publication except as authorized by the commission. *Id.*

Pursuant to § 393.150, a utility may file a schedule stating a new rate or charge, rule or regulation, which shall become valid unless suspended by the commission, *see State ex rel. Jackson County v. Public Service Comm'n*, 532 S.W.2d 20, 28–29 (Mo. banc 1975), *cert. denied*, 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), on its own motion or upon complaint of interested parties as authorized by the statute. If suspended, the commission must within a specified period hold a hearing concerning the propriety of the new rate, charge, rule or regulation. Section 393.150. A hearing may also be had without the filing of a new rate, *if a complaint is filed, or on motion of* the commission, §§ 393.260, 386.390. The commission may investigate any matter as to which a complaint may be filed, or in order to enable it to ascertain facts requisite to the exercise of any powers conferred upon it. Section 393.270(1). At the conclusion of any hearing and investigation, the commission shall set the maximum price to be charged for the electricity, §§ 392.270(2), 393.270(3). An interim rate increase may be requested where an emergency need exists, *State ex rel. Laclede Gas Co. v. Public Service Comm'n*, 535 S.W.2d 561, 568 (Mo. App.1976); § 393.150.

Such a system of regulation is necessary, despite the expense and time required to investigate utility costs, hold hearings and fix rates because:

"despite the existence of substantial competition [between types of utilities], actual as well as theoretical, . . . some alternative to price determination by the laws of supply and demand plainly is necessary. Regulation of rates and standards of service is the only technique we have evolved for dealing with the problem, short of [government operation]." Priest, 1 Principles of Public Utility Regulation 2 (1969).

"This system is designed to protect consumers against exploitation where competition is inherently unavailable or inadequate, and to insure that these industries will serve the public interest. At the same time it provides these companies necessary assurance of an opportunity to earn a reasonable return on their investment and to attract capital for expansion." *Id.* at 4, quoting Joseph C. Swidler, Chairman, Federal Power Comm'n, speech (February 4, 1965).

As is apparent from the above summary of the relevant statutes, in order to carry out its statutory duties and effectuate the legislative policy objectives embodied therein, the commission must supervise, regulate and control the public utilities within its jurisdiction, *see Kansas City Power & Light Co. v. Midland Realty Co.*, 338 Mo. 1141, 93 S.W.2d 954 (banc 1936), *aff'd* 300 U.S. 109, 57 S.Ct. 345, 81 L.Ed. 549 (1937), *rehearing denied*, 300 U.S. 687, 57 S.Ct. 504, 81 L.Ed. 888 (1937). It can do so, under the statutes, either by "approval of rate schedules filed with it or by order after investigation or hearing." *May Dept. Stores*, 107 S.W.2d at 57, §§ 393.150, 393.-270. The ultimate purpose of such action is

to fix a rate which is just and reasonable both to the utility and to its customers, *State ex rel. Valley Sewage Co. v. Public Service Comm'n*, 515 S.W.2d 845, 851 (Mo. App.1974). The lawful rate is that fixed by the commission, *see* §§ 393.270(2), (3), which rate has the same force and effect as if set by the legislature, *State ex rel. Jackson Co.*, 532 S.W.2d at 28. Only one exception to this system of fixed, rather than variable, rates is specified in the statutes, the "sliding scale" rate, § 393.130(4), discussed *infra*.

▇▇▇ Since it is purely a creature of statute, the Public Service Commission's powers are limited to those conferred by the above statutes, either expressly, or by clear implication as necessary to carry out the powers specifically granted, *State ex rel. City of West Plains v. Public Service Comm'n*, 310 S.W.2d 925, 928 (Mo. banc 1958). Thus, while these statutes are remedial in nature, and should be liberally construed in order to effectuate the purpose for which they were enacted, "neither convenience, expediency or necessity are proper matters for consideration in the determination of" whether or not an act of the commission is authorized by the statute, *State ex rel. Kansas City v. Public Service Comm'n*, 301 Mo. 179, 257 S.W. 462 (banc 1923). Once it is determined that an act is within the commission's authority, of course, these considerations and others become part of the broad discretion accorded the commission to set just and reasonable rates. It is within this context, giving full consideration to the policy objectives of the legislature, that we must consider the power of the commission to permit a fuel adjustment clause. *State v. Kraus*, 530 S.W.2d 684, 685 (Mo. banc 1975); *State v. Wright*, 515 S.W.2d 421, 427 (Mo. banc 1974).

## V. Fuel Adjustment Clauses in General

▇▇▇ A fuel adjustment clause (FAC), once authorized by the commission as a part of the utility's rate structure, enables the utility to pass on to the consumer any increase (or decrease) in the cost of fuel automatically and without any need for further consideration of compensatory decreases (or increases) in other operating expenses. As such, it is a radical departure from the usual practice of approval or disapproval of filed rates, in the context of a general rate case. Even under the file and suspend method, by which a utility's rates may be increased without *requirement* of a public hearing, the commission must of course consider all relevant factors including all operating expenses and the utility's rate of return, in determining that no hearing is required and that the filed rate should not be suspended. *See State ex rel. Missouri Water Co. v. Public Service Comm'n*, 308 S.W.2d 704, 718–19, 720 (Mo.1957). However, a preference exists for the rate case method, at which those opposed to as well as those in sympathy with a proposed rate can present their views. *See State ex rel. Laclede Gas Co. v. Public Service Comm'n*, 535 S.W.2d at 574.

Numerous objections have been raised to the use of fuel adjustment clauses. Even those states which approve them have required numerous safeguards surrounding their use, as has the commission in this case. The principal objections have been that to permit such automatic adjustments would be an abdication of the commission's rate making function; that it would violate the spirit and purpose of regulatory law; that it allows an increase in rates without consideration of all factors, thus overweighing the effect of one factor, and ignoring compensating economies; that it shifts the burden of proving reasonableness or unreasonableness from the utility to the consumer; that it violates the principle that utility rates should be definite and published in order to insure stability and notice of rates to consumers and in order that consumers understand their rates and thus have the knowledge necessary to determine if complaint is warranted; that utilities would lose any incentive to keep down fuel costs where they know such costs can be fully and automatically passed on to the consumer; and that presence of a fuel adjustment clause may bias selection of fuels or production methods so that the utility will chose the method which allows it to pass on the

most cost and is thus cheapest to it, rather than the method which is cheapest overall. *See* e. g. discussion and cases cited in Foy, Cost Adjustment in Utility Rate Schedules, 13 Vanderbilt L.Rev. 663, 664 (1959–60); Trigg, Escalator Clauses in Public Utility Rate Schedules, 106 U.Pa.L.Rev. 964, 969–973 (1957–58); Martin, The Fuel Adjustment Clause and Its Role in the Regulatory Process, 47 Miss.L.J. 302, 309 (1976).[2]

Conversely, traditional ratemaking methods have been subjected to severe criticism in that they are expensive and time consuming to the detriment of both the utility and consumers. The fuel adjustment clause is considered a more efficient and effective substitute because, among other reasons, it reduces "regulatory lag" and thus permits a utility to recover increased fuel costs in times of inflation without undue delay that could be harmful to its economic structure and thus reduce investors' incentives to invest in the utility. Permitting such automatic adjustment would also reduce the expense of the regulatory process by decreasing both the magnitude and frequency of rate cases. Administrative safeguards could prevent most possible abuses mentioned by opponents of FAC's. The factors combine to justify an FAC as a means of "integrating public utility rates, which are generally of a rigid nature, into a flexible national economy." *Re Central Maine Pow-er Co.,* 22 P.U.R.3d 466, 469 (Maine 1958). *See* Foy, 13 Vanderbilt L.Rev. at 668–69; Trigg, 106 Pa.L.Rev. at 969–73; Martin, 47 Miss.L.J. at 310.

Numerous public service commissions have approved fuel adjustment clauses in the face of the above arguments principally because of a fear of inflation. Fewer courts have addressed the legal basis for the use of an automatic adjustment clause. The two leading cases approving such clauses, generally relied on in other cases, are *Norfolk v. Virginia Electric and Power Co.,* 197 Va. 505, 90 S.E.2d 140 (1955), and *Chicago v. Illinois Commerce Comm'n,* 13 Ill.2d 607, 150 N.E.2d 776 (1958).[3] However, as the supreme court of Wisconsin noted in *Wisconsin's Environmental Decade, Inc. v. Public Service Comm'n,* 81 Wis.2d 344, 260 N.W.2d 712, 715 (1978), in disapproving an expanded adjustment clause allowing automatic adjustment of costs of power, labor, supplies, steam, and electrical expenses and supervision as well as fuel:

> "[I]t is not up to this court to strike the appropriate balance between public participation and simplicity in rate proceedings. That determination is for the legislature. The determinative issue in this case is whether, giving sec. 196.20(2), Stats., a fair construction, the legislature has authorized the PSC to permit the use of expanded adjustment clauses."

**2.** The commission itself stated in rejecting extension of fuel adjustment clauses to residential rate structures as late as 1971, *Re Union Electric Co.,* 92 P.U.R.3d 254, 262 (Mo.1971):

> "The company has proposed that a fuel rider, heretofore only applied to industrial customers, be now applied to all its customers' sales other than street and dawn to dusk lighting sales. Under such a tariff, the company would automatically change its rates to its customers to compensate the company for any increase in fuel costs. In this instance, the fuel costs for company are basically a result of the cost of coal delivered to its generating plants. This commission would have no authority to investigate or determine if such price changes in coal were warranted. Furthermore, under such a proposal, management would not be encouraged to bargain for the lowest coal rates possible when it would know any increase would be immediately "flowed through" to customers. Also, many other factors, other than cost of fuel, affect this company's rate of return. We do not feel it is good regulation to set aside this one element of expenses for special treatment while ignoring the total overall picture of expenses and resultant rate of return."

**3.** Both cases basically hold that because the FAC *formula* filed is fixed, the rates and charges therein resulting from application of the formula "are as firmly fixed as if they were stated in terms of money." *Chicago,* 150 N.E.2d at 779; *Norfolk,* 90 S.E.2d at 148. While recognizing that rate schedules may consist of rules as well as dollar rates, *City of West Plains,* 310 S.W.2d at 929, we cannot agree that the fact that a fixed formula is filed means that a fixed rate results. The rates filed per the formula vary, and do so without regard to other factors; this is the very purpose of including the automatic adjustment clause. See discussion *infra* parts III, IV.

So here, our determination is limited to whether or not a fuel adjustment clause has been authorized by the legislature. We conclude not, and thus need not go on to consider whether the commission's order was reasonable and supported by substantial and competent evidence.

## VI. Authority for Fuel Adjustment Clause

Respondents argue application of the FAC to its residential rate structure is authorized because the commission carefully reviewed the legal basis for authorizing these rates, and because the commission and other states in the past permitted such rates. This information, of course, does not aid our inquiry into whether such rates are authorized. Of no greater help is the summary statement that chapter 393, RSMo 1969, gives the PSC full authority over rates. The only substantial support cited for the PSC's authority to permit an FAC is *Hotel Continental v. Burton*, 334 S.W.2d 75 (Mo.1960).

In that case, this court affirmed an order of the circuit court affirming the commission's power in a rate case to permit the Kansas City Power & Light Co. to include in its rate schedule a tax adjustment clause (TAC) which permitted the company to state separately on each customer's bill a charge equal to any part of a license, occupation, or other similar fee or tax applicable to service by the utility to that customer and imposed by local taxing authorities on the basis of gross receipts. This court concluded that the TAC was a rule or practice relating to a rate, pursuant to § 393.150, RSMo, and that it could become a part of a rate schedule approved by the commission pursuant to the latter's power to set just and reasonable rates, inasmuch as that power included the power to treat one item of operating expense differently than another. It also permitted the amount of gross receipts tax imposed to be increased or decreased. Respondents assert that the same reasoning which supported the commission's authority to allow a TAC would support its authority under the statutes to permit a fuel adjustment clause. We cannot agree.

The court was very careful in *Hotel Continental* to limit its holding to the specific type of clause before it, a TAC. In describing the power of the commission to carry out its duty to set just and reasonable rates, we concluded, as respondents note, that the commission has the power to treat one item of operating expense differently than another, and, further, that it can determine which items should be included in operating expenses and which items should not be included.[4] There is no doubt that this is a valid statement, insofar as the commission does not breach other facets of the relevant statutes in exercising this general power in a particular case. It is to this latter point, the particular exercise of this power, that the court addressed itself in the rest of the opinion. It continued: "Appellants say further that the commission's order is unlawful because its approval of the tax adjustment clause is contrary to statutory mandate in that it permits the company to increase or decrease its rates without filing new rate schedules and thereby denies interested parties an opportunity to be heard as to the propriety of the changed rates." *Id.* at 80.

The court then went on to discuss whether, under the powers of the commission outlined above, it had the authority to permit a separate statement of the gross receipts tax charge on each bill, as it existed and was approved at the time of the hearing, and secondly, whether an automatic adjustment of that charge was permissible.

The first question was answered in the affirmative, for the commission had determined in the course of the ratemaking proceeding below that the amount of the charge was proper, and pursuant to its authority to prescribe rules relating to rates it could of course authorize statement of the charge separately on the bill.

In considering the automatic adjustment of the tax clause itself, however, the court did not speak as broadly. It noted that the amount of the tax was a valid expense item which no one questioned the utility had a

---

4. *See City of West Plains*, 310 S.W.2d at 928–29.

right to collect; that "the amount of an expense item represented by the amount of a valid tax is not affected by economy of operation in other respects or by greater volume of sales or by variations in the amounts of any other expense items", *id.* at 82, and that the sole purpose of the TAC was to recover the exact amount of an increase or decrease in the gross receipts tax. It concluded that:

> "The commission does not lose supervisory control over company's operation because of the automatic tax adjustment clause contained in the present order. The company's rates are still subject to the commission's supervision. *Those rates, however, are not and cannot be affected one iota by the amount of, or any change in the amount of, the money company must collect with which to pay its gross receipts tax, except in the exact amount by which that tax is increased or decreased.*" *Id.* (emphasis added).

That is to say the tax was a *direct* charge, exactly proportioned to the customer's bill, the amount of which was directly determined by the amount of that bill. Effectively, the tax was imposed on the amount of the customer's bill, and hence its amount was governed by the other amounts charged the customer. Any change in other cost factors could not change this direct relationship, and thus any change in the tax rate could properly be taken into consideration under the TAC without regard to changes in other costs and without disturbing the statutory scheme that changes in rates of return not occur without considering all cost factors and without public awareness and understanding of rates proposed to be charged.

In this context, the court concluded that the TAC was lawful, despite the fact that no new hearing would be held before each adjustment made pursuant to the TAC in response to a change in the gross receipts tax itself, because at the hearing below in the ratemaking case in which the TAC was approved:

> "the commission took into consideration the circumstance that the tax might be

increased or decreased and provided that the company would gain or lose revenue in an amount exactly equal to the increased or decreased amount necessary to pay the tax item. *Consequently, the order operates so that the approved rate of return of necessity remains the same,* provided, of course that the *only* substantial change in the company's operation is the gross receipts tax rate . . ." *id.* at 81–82 (emphasis added, except in final clause).

The distinction between the gross receipts tax and other items of cost to the utility was further underscored by the court in discussing the reasonableness of the commission's order, wherein it noted that the evidence showed:

> "*that the only items of operating expense which are directly related to the company's gross revenues are the gross receipts tax and the state sales tax; that those two items fall into a separate category*; that the company collects for the state the sales tax which is paid by the customers as a separate item added to the bills; that under the order proposed the gross receipts tax would be separately itemized on the bill but the amount of tax due would be a part of the customer's total cost, *i. e., the customer cost is the same whether the gross receipts tax is shown as a separate item or is included in the steam rate as such*; that the gross receipts tax is an expense item which well may be dealt with as an item segregated from other expense items; *that other tax items (other than sales tax) do not lend themselves to such segregated handling*; that the gross receipts tax is *subject to change at any time by the city council.*" *Id.* at 84. (emphasis added).

The court concluded that the evidence justified the commission's order and that the TAC was lawful.

▓ It is readily apparent that *Hotel Continental* does not support respondents' position. While it stated, and we affirm, that as a part of its duty of setting reasonable rates, the commission has the power to treat some items of operating expense dif-

ferently than others, it also recognized that such separate treatment must be effectuated in compliance with all of the statutes governing the PSC and with the purpose behind those statutes. To allow an automatic adjustment of a gross receipts tax, as this court so carefully pointed out, did not conflict with the purposes of the statute, for the tax items so separately treated were different in kind from other items of operating expense. That is, whether or not the tax charge increased or decreased could have no effect on the company's rate of return, for the charge, whatever it was, would go to the government and would not affect the company's revenue. It could not result in an excessive charge to the customer, for it was directly apportioned to his use of the utility, and its amount could be exactly determined. Further, no economies in other operations could offset the increased cost of the tax.

▆▆ In contrast, a fuel adjustment clause would not be of such limited scope. While it could nominally be considered a "rule relating to a rate", as was the tax adjustment clause, the commission does not thereby gain power to permit its use if this would in effect initiate a new method of granting rate increases. As noted in *Hotel Continental*, non-tax operating costs (such as fuel) fall into a wholly separate category than does the tax cost at issue in that case. Although in their brief respondents attempt to distinguish a fuel adjustment clause from an adjustment clause for labor, supplies, construction and so forth on the basis that fuel is the largest single expense item, in oral argument they admitted that the rationale behind authorization of a fuel adjustment clause could be used to justify adjustment clauses covering these other items of operating expense. To permit all such costs to be automatically adjusted would create a third method of approval of rates not within the contemplation of the authorizing statutes.

Unlike the tax adjustment clause approved in *Hotel Continental*, a charge under a fuel adjustment clause is not a direct charge. A tax adjustment charge is fig-

ured by determining the amount of gross receipts tax applicable to the amount of the customer's bill. The fuel adjustment charge is figured by estimating the amount of sales which will be made in a given month and *allocating* to each kilowatt-hour sale a percentage of the increase in fuel costs incurred during a prior month. Thus, if higher costs are incurred in January, the amount of these costs each customer will pay in March will depend in part not only on the amount of electricity he uses but on the total amount of electricity used. If fewer sales are made, his proportionate charge will be greater than if more sales are made.

Additionally, the fuel adjustment charge will be affected by a utility's management decisions such as choice of fuel, choice of generating unit, the efficiency of that unit and similar operational matters. The average cost per kilowatt-hour will also be affected by overall use of energy during peak hours, when less efficient generators may have to be added to supply all necessary power, even though the individual consumer may in fact use electricity primarily during non-peak hours. Further, since in our mobile society customers move in and out of the territory of any particular utility as they change jobs or careers, new customers in, for example, October will be charged for an actual increase in fuel costs incurred in August when different customers were using electricity for air conditioning, etc. We do not mean to imply that the method of allocation approved by the commission is not a good or reasonable one, if authorized, but simply to state that given these factors fuel costs are not directly assignable to the fuel use of the customer and thus that they cannot be put in the same category as a gross receipts tax cost, which enters the picture only once the service relationship of the company and consumer is over, at least for that month, and is simply added as a charge to the bill in the month the bill is paid.

Finally, we note that adjustment of a TAC cannot affect the rate of return of the utility, since economies of operation cannot

be used to increase or decrease it directly. While fuel costs are to a large extent dependent on general market conditions and periodically fixed contract costs, the utility does exercise control over its fuel costs when it negotiates fuel contracts or chooses what fuel to buy or burn in what generating unit.[5] It also is possible to offset fuel costs with savings from efficiencies in other areas of operation, such as salaries, wages, taxes, depreciation and materials and supplies other than fuel. This, of course, does not necessarily mean that a fuel adjustment clause is not authorized by statute, but it does mean that it is not authorized as simply an extension of the reasoning in *Hotel Continental.* We must now determine whether it is otherwise authorized by statute.

Respondents themselves have difficulty pointing to what provisions in the statutes give them authority to utilize a fuel adjustment clause. In their brief, as noted *supra,* they simply argue that "it is clear that the statutes and case law in Missouri authorize such provisions." In oral argument, they admitted that it was hard to find specific sections authorizing an FAC, but that we should approve it on the basis of §§ 393.130, 393.140, and 393.270, and through application of the principle that where an agency is given broad supervisory authority, deference should be given to its interpretation of a statute, citing *State ex rel. Jackson County,* 532 S.W.2d 20, and *State ex rel. Laclede Gas Co.,* 535 S.W.2d 561. Since FAC's have been used in regard to industrial and large commercial users for 60 years, and because other jurisdictions approve them, it is posited that we should also approve them.

It is for the legislature, not the PSC, to set the extent of the latter's jurisdiction. The mere fact that the commission has approved similar clauses in the past, or that other states permit them, is irrelevant if they are not permitted under our statute, *State ex rel. Philipp Transit Lines, Inc. v.*

*Public Service Comm'n,* 552 S.W.2d 696, 702 (Mo. banc 1977); *State ex rel. Springfield Warehouse & Transfer Co. v. Public Service Comm'n,* 240 Mo.App. 1147, 225 S.W.2d 792, 794 (1949).

The sections cited by respondents in support of their position do not strengthen it. Section 393.130(4) and § 393.270(3) refer to a "sliding scale" rate. Although no specific reference to this term was made in respondent's brief or in oral argument, the utilities did argue before the commission that the provision for a sliding scale authorized a fuel adjustment clause, and in their briefs in this court appellants responded to such argument. The commission relied in part on this provision in its 1974 order. Since respondents did refer us to the provisions containing this term, we will discuss its applicability to the use of an FAC.

Section 393.130 specifies that generally the same rate must be charged to all within the same class, but that this should not be construed to prohibit "establishing a sliding scale for a fixed period for the *automatic adjustment of charges* for gas, electricity, . . . service rendered or to be rendered *and* the *dividends* to be paid stockholders of such . . . electrical corporation . . ." § 393.130(4) (emphasis supplied). In order to permit sliding scales, § 393.270(3) excepts the case of a sliding scale from the requirement that the price fixed by the commission be the maximum price.

A "sliding scale" was defined in *Bertha A. Mining Co. v. Empire Dist. Electric Co.,* 210 Mo.App. 622, 235 S.W. 508 (1921) as tying automatic adjustment of charges to dividends to be paid stockholders. In that case, plaintiff sought to hold the utility to a contract which it entered into with defendant on January 23, 1915 at lower rates which were in accordance with the rates then fixed by the commission, as opposed to higher rates fixed by an order of the commission effective January 1, 1918. Plaintiff

---

**5.** In the May 30, 1979 edition of the Wall Street Journal, p. 10, it is reported that the Tennessee Valley Authority is considering cancelling a 6.5 percent, or $100 million, electricity rate increase scheduled to take effect in July because

of reduced fuel cost estimates. Fuel cost estimates were said to be $137 million less than earlier projected for fiscal 1979 because of increased production by its hydroelectric plants and nuclear power plant.

argued that the January 23, 1915 contract was excepted by § 10478, RSMo 1919, (now § 393.140) as being of the "sliding scale" variety, as it varied the hourly rate according to the number of hours used per month and provided for a discount which increased as the hours of use increased.

The court, after noting that the only possible authorization for the contract provision was that it was a sliding scale, went on to hold that it was not a sliding scale arrangement within the statutory authorization for various reasons, one of which was that such a sliding scale "must be for the automatic adjustment of the charges for electricity . . . and the dividends to be paid stockholders." *Id.* 235 S.W. at 510. The court quoted with approval the following from *In re Boston Consolidated Gas Company, Mass. Board of Gas & Elec. Light Commissioners*, 1919A P.U.R. 699: "The essential characteristic of this method of regulating the price of gas is by a prearranged automatic and interdependent adjustment of the price to consumers and the rate of dividends to stockholders, whereby for every decrease or increase in the price the stockholders are permitted an increase or suffer a decrease in the rate of dividend." *Id.* at 511. There is nothing of this sort of arrangement in any aspect of the FAC here under consideration.

The court in the *Bertha Mining Company* case went on to quote and adopt the explanation of "sliding scale" given in the 2d edition of Pond Public Utilities, § 463, reprinted in 2 Pond Public Utilities § 573 (4th ed. 1932):

> "The fixed rate can be reduced without materially affecting the net income by improving the service and extending the field to which the service is furnished, because a reduction in the rates as well as the improvement and extension of the service will naturally result in increasing the volume of the business with the effect of increasing the net income sufficiently · to permit of a reduction in the rates without actually decreasing the income, . . . *Recognition of this fact is the basis of the so-called sliding scale, whereby the income which the municipal public utility is permitted to earn is increased as the rate charged for the service rendered is decreased."* Bertha A. Mining Co., 235 S.W. at 510. (emphasis added). *See* Bonbright, Principles of Public Utility Rates, 263 n. 21 (1961).[6]

The legislature has re-enacted the provision construed in *Bertha A. Mining Co.*, and we must presume it thus concurred in the interpretation of "sliding scale" set out therein. *State v. Crawford*, 478 S.W.2d 314, 317 (Mo.1972), appeal dismissed, 409 U.S. 811, 93 S.Ct. 176, 34 L.Ed.2d 66 (1972), *rehearing denied*, 409 U.S. 1051, 93 S.Ct. 536, 34 L.Ed.2d 505 (1972); *State ex rel. Missey v. Cabool*, 441 S.W.2d 35 (Mo.1969). By permitting an exception to the fixed rate system in the case of the sliding scale, the legislature by implication intended no other exceptions exist, *Giloti v. Hamm-Singer Corp.*, 396 S.W.2d 711 (Mo.1965); *Brown v. Morris*, 365 Mo. 946, 290 S.W.2d 160 (1956); *Nevada v. Bastow*, 328 S.W.2d 45 (Mo.App.1959). The sliding scale defined in § 393.130 is not authorization for an FAC.

Respondents, however, state that the statutes as a whole do support their power to utilize a fuel adjustment clause. Section 393.130 generally sets out basic rules governing the giving of safe and adequate service by the utility, and prevents preferential rates being given one customer.

---

6. *But see El Dorado v. Arkansas Public Service Comm'n*, 235 Ark. 812, 362 S.W.2d 680, 692 (1962), which interprets "sliding scale" to permit a fuel adjustment clause. There is no discussion in this case of what "sliding scale" means; the court simply states that this provision applies to adjustment clauses. As noted *supra*, we have not so interpreted the term.

Parenthetically, we note that under our statute a sliding scale rate, before it becomes effective, "shall first have been filed with and approved by the commission", § 393.270(3). This requires that the commission actually *approve* the rate, rather than merely permit it to take effect. Of course, the commission's order stating in advance that tariffs filed in accordance with the established formula would not be suspended would not conform to this requirement.

Section 393.140 sets out the general powers of the commission. While this statute gives the PSC general supervisory power over electric utilities, as discussed *supra*, it gives the PSC broad discretion only *within* the circumference of the powers conferred on it by the legislature; the provision cannot in itself give the PSC authority to change the rate making scheme set up by the legislature.

Section 393.270 empowers the commission to investigate matters about which complaint may be made, or to investigate to ascertain facts necessary to the exercise of its powers and to fix *maximum* rates after hearing and investigation upon consideration of all relevant factors. These provisions give no authority, as we read them, to establish a variable rate by use of a fuel adjustment clause, and in fact disallow such a clause, in that they establish a fixed-rate rather than a variable-rate system, § 393.-270(2), (3), and prescribe the manner in which such rates are to be established.

As discussed, *supra*, rate increases can normally be approved either by the file and suspend method, or through a full blown rate hearing. Under either method, a maximum rate must be *fixed* by the commission. This is in keeping with the general statutory system discussed above of fixed rates filed by the utilities to remain in effect until a new rate is approved or permitted to take effect. Although no hearing by the commission is required before a new rate goes into effect under the file and suspend method, the commission is nonetheless required, in determining whether or not to suspend the proposed rate, to consider all factors relevant to the proper maximum price to be charged. Section 393.270(4) states that the commission:

"may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard, among other things, to a reasonable average return . . . ."

This court has interpreted that provision, in a case addressing the method of valuation of property in determining the utility's proper rate of return: "[T]he phrase 'among other things' clearly denotes that 'proper determination' of such charges is based upon *all* relevant factors," *State ex rel. Missouri Water Co. v. Public Service Comm'n*, 308 S.W.2d 704, 719 (Mo.1957), and that:

"however difficult may be the ascertainment of relevant and material factors in the establishment of just and reasonable rates, neither impulse nor expediency can be substituted for the requirement that such rates be 'authorized by law' and 'supported by competent and substantial evidence upon the whole record.' Article V, § 22, Constitution of Missouri, V.A.M. S." *Missouri Water Co.*, 308 S.W.2d at 720.

Although the quoted section of the statute refers to "complaints", the requirement that all relevant factors be considered is of course applicable under the file and suspend method also. *Missouri Water Co.* was itself an appeal by the water company from a rate fixed by the commission after hearing under the file and suspend method. As stated in *May Dep't Stores Co. v. Union Electric Co.*, 341 Mo. 299, 107 S.W.2d 41, 50 (1937), quoted with approval in *State ex rel. Jackson County*, 532 S.W.2d at 28:

"These provisions mean that a public utility may by filing schedules suggest to the commission rates and classifications which it believes are just and reasonable, and, if the commission accepts them, they are authorized rates, but the commission alone can determine that question and make them a lawful charge."

By permitting an electric utility to utilize a fuel adjustment clause, the commission permits one factor to be considered to the exclusion of all others in determining whether or not a rate is to be increased. That is, although the FAC may not *itself* be a rate, by approval of an FAC in a utility's rate schedule, the commission in advance approves any increase (or decrease) in rates which will automatically result through application of the FAC if the price of fuel to the utility increases or decreases. It would

exalt form over substance to say that approval of an FAC is proper because the FAC is merely a "rule relating to a rate" and not a rate itself, where the effect of such approval is to permit increases in rates in a manner not provided by the statutes. It would also come at least dangerously close to abdication by the commission of its power to set just and reasonable rates, for the commission has determined in advance that any fuel charge made in accordance with the prescribed formula will be proper without regard to whether, in light of other cost factors, the overall charge is reasonable. The commission would, of course, retain the authority to suspend any rate filed, but effectively, if not nominally, the burden of going through numerous reports and checking fuel costs would be shifted from the utility to the commission. As once stated by the Illinois Public Service Commission, its power to set rates would thus be delegated "to be sure, permissively and subject to recall, but none the less effectively," *Re Rockford Electric Co.*, 1917F P.U.R. 196, 200 (Ill.1917).

Not only would a fuel adjustment clause permit new "rates" to go into effect without consideration of other factors and thus without a framework in which to determine if overall rates are reasonable, it would also negate the effect of § 393.140(11), by which all rates are printed and open for public inspection. The purpose of thus providing the customer with a method of ascertaining what rates are in effect and enabling him to take the appropriate steps to challenge those rates would be destroyed with a fuel adjustment clause. Upon reference to the filed rate schedule of the utility, the consumer would be confronted with a formula and a rate filed as a result thereof. While it is debatable that representatives of large industrial or commercial customers might understand such a system, the average consumer could not be expected to do so. It is no answer to say that few understand the rates previously filed; this argument merely demonstrates the need to avoid further complication.

Finally, as noted *supra*, the rationale behind a fuel adjustment clause could be used to justify other automatic adjustment clauses for most remaining operating expenses. Having established a toehold with our decision in *Hotel Continental*, we will not travel further down the "slippery slope" and risk a dismantling of the carefully balanced fixed rate system established by the legislature.[7] While in itself the clause looks innocuous, and while the cost of fuel may look high, to permit such a clause would lead to the erosion of the statutorily-mandated fixed rate system. If the legislature wishes to approve automatic adjustment clauses, it can of course do so by amendment of the statutes, and set up appropriate statutory checks, safeguards, and mechanisms for public participation. As of this date the only exception to the fixed rate system approved by the legislature is a sliding scale rate. We cannot imply an intent to allow a further exception where to do so would upset the fixed-rate system set up in the statutes. If the electric companies are faced with an "emergency" situation because of rising fuel costs, they can take advantage of the method set up by the legislature to deal with such situations and file for an interim rate increase on the basis of an abbreviated hearing, *State ex rel. Laclede Gas Co.*, 535 S.W.2d at 566–67.

Since there was no authority to permit a fuel adjustment clause, there was no authority to permit a roll-in of the amount of fuel costs previously collected under the old clause or to allow a surcharge for the

---

7. *See, e. g., Bounds v. Smith*, 430 U.S. 817, 837, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (Rehnquist, J., dissenting); *Walz v. Tax Commission of the City of New York*, 397 U.S. 664, 700, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring); *Democratic National Committee v. F. C. C.*, 156 U.S.App.D.C. 368, 374, 481 F.2d 543, 549 (1973) (affirming F.C.C.'s finding that, in its words, a broad interpretation of an earlier decision would " 'lead us down a slippery slope with a consequent undesirable diminution of license responsibility . . . [since] a continuing series of *ad hoc* rulings by the Commission which necessarily constitute special departure from the general fairness weighing process would inevitably push the Commission further and further into the programming process.' ")

amounts not collected under either clause but to which the utilities claim they are entitled. We thus reverse the judgment of the circuit court affirming the order of the commission allowing the fuel adjustment clause, the roll-in and the surcharge.

## VII. Remedies

### (A) *FAC and Roll-In*

■ Public counsel requested in oral argument that we remand to the commission for a determination by it of the excess amounts collected by the utilities under the FAC over that which they would have collected under a just and reasonable rate, which would include rate increases properly authorized, and to order a refund of any such excess.

■ However, to direct the commission to determine what a reasonable rate *would have been* and to require a credit or refund of any amount collected in excess of this amount would be retroactive ratemaking. The commission has the authority to determine the rate *to be charged*, § 393.270. In so determining it may consider past excess recovery insofar as this is relevant to its determination of what rate is necessary to provide a just and reasonable return in the future, and so avoid further excess recovery, *see State ex rel. General Telephone Co. of the Midwest v. Public Service Comm'n,* 537 S.W.2d 655 (Mo.App.1976). It may not, however, redetermine rates already established and paid without depriving the utility (or the consumer if the rates were originally too low) of his property without due process. *See Arizona Grocery Co. v. Atchison, Topeka & Santa Fe R. Co.,* 284 U.S. 370, 389–90, 52 S.Ct. 183, 76 L.Ed. 348 (1932); *Board of Public Utility Commissioners v. New York Telephone Co.,* 271 U.S. 23, 31, 46 S.Ct. 363, 70 L.Ed. 808 (1926); *Lightfoot v. City of Springfield,* 361 Mo. 659, 236 S.W.2d 348, 353 (1951).

This does not mean that the utilities have received a windfall profit of the amounts illegally collected. If no fuel adjustment clause or roll-in had been in effect, the utilities would have had a right to file for an increased rate, in order to allow them to recover their increased fuel costs and ·to maintain a just and reasonable rate. While the amounts they would have collected may not exactly match those collected under the fuel adjustment clause, to order a refund of the latter amounts would clearly be confiscatory, and to order an offset of this refund by what a "reasonable rate" would have been would be (retroactive) rate making at the order of this court, something we cannot do. The surcharge, however, is not subject to this difficulty.

### (B) *Surcharge*

■ Under the terms of the FAC approved in 1974, fuel expenses could not be recovered until after a 60–120 day time lag required to determine the proper amount of recovery. The 1976 order reduced this lag. However, fuel costs incurred in the final months before the effective date (June 1, 1976) of the FAC approved in 1976 were not collectible under the old clause because it expired before the necessary lag-time had elapsed. The commission thus enacted a surcharge to allow the utilities to collect these expenses incurred when the old clause was in effect but not collectible under the old clause before it expired. This surcharge is of course illegal in that it is intended to allow collection of monies which could only be collectible due to authorization of a fuel adjustment clause. However, even if a fuel adjustment clause were permitted, the question arises whether the surcharge would be allowable or whether it is unwarranted under any theory.

The utilities argue that this order was permissible, assuming a fuel adjustment clause was permissible, because the commission had a right to treat these uncollected expenses differently than other expenses, and that these are "current fuel expenses which were being collected (with an admitted lag) under the previous fuel adjustment", and thus their collection by surcharge was not retroactive rate making. We disagree.

The utilities cannot mean that the amount of the fuel adjustment charge is determined by *present* ("current") expenses

in the month collected, and the fuel expenses of two or three months earlier are simply used as "test month" expenses, because from their brief and under the commission's order, it is apparent that their complaint is that no recovery was had for expenses *incurred* in one of the months during which the fuel charge was in effect. There would be no need to "surcharge" if present expenses were at issue for then the new FAC would cover these expenses.

If the utilities mean that the expenses were "current" expenses in that they were expenses reasonably anticipated and intended, under the old clause, to be recovered at some point and were simply "uncollected revenues", they are incorrect. These expenses were not "uncollected" in the sense that they were delayed in collection because of a mail strike, or a dispute as to amount due. They were uncollected because they were not collectible under the terms of the old FAC before it expired. That clause, which by its nature included the time lag complained of, was expressly made effective for only two years, at which point the PSC would determine whether and in what fashion to continue it in effect. The utilities were aware at the time they filed their fuel adjustment tariffs that the 1974 clause might be discontinued or changed in 1976. It was changed and certain expenses which would have been recoverable had the old clause remained in effect were not recoverable, under the terms of that clause, before it expired, just as expenses which might have been recoverable under a hypothetical filed base rate would not be recoverable if a new and lower base rate became effective. The commission could not in the latter case, and cannot in regard to the FAC, put a surcharge into effect to allow recovery of expenses which would only have been recoverable had the old rate continued in effect.

The utilities take the risk that rates filed by them will be inadequate, or excessive, each time they seek rate approval. To permit them to collect additional amounts simply because they had additional past expenses not covered by either clause is retroactive rate making, i. e., the setting of rates which permit a utility to recover past losses or which require it to refund past excess profits collected under a rate that did not perfectly match expenses plus rate-of-return with the rate actually established, *Board of Public Utility Commissioners v. New York Telephone Co.*, 271 U.S. at 31, 46 S.Ct. 363; *Lightfoot v. Springfield*, 236 S.W.2d at 353. Past expenses are used as a basis for determining what rate is reasonable to be charged in the future in order to avoid further excess profits or future losses, but under the prospective language of the statutes, §§ 393.270(3) and 393.140(5) they cannot be used to set future rates to recover for past losses due to imperfect matching of rates with expenses. *Detroit Edison Co. v. Mich. Pub. Serv. Comm.*, 82 Mich.App. 59, 266 N.W.2d 665; *State ex rel. Utilities Comm'n v. Edmisten*, 291 N.C. 451, 232 S.E.2d 184 (1977). *Cf. Jersey Central Power and Light Co. v. Federal Energy Regulatory Comm'n*, 587 F.2d 142 (3d Cir. 1978); *Virginia Electric & Power Co. v. Federal Energy Regulatory Comm'n*, 580 F.2d 710 (4th Cir. 1978); *but cf. Maine Public Service Co. v. Federal Power Comm'n*, 579 F.2d 659 (1st Cir. 1978).

Since the surcharge thus enabled the utilities to collect monies not collectible under the rate filed at the time the expenses intended to be recoverable under the surcharge were incurred, the utilities have no vested right in the monies collected. They were not only collected under an established rate which was later determined to have been beyond the authority of the commission to allow, as in the case of the FAC, but were also an *additional* recovery to that which had been allowed under the rates in force during the relevant period. The result was to require consumers to pay monies which should not have been paid.

The utilities have no vested right to or legitimate expectation in monies collected in this manner. To permit them to keep these monies would be a windfall to them and would leave their customers without a remedy for recovery of this unlawfully collected surcharge. We have an inherent

power to afford redress for an erroneous judgment which results in the paying over of monies from one to another without support of law and to direct that restitution be made. *Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co.,* 249 U.S. 134, 143–46, 39 S.Ct. 237, 63 L.Ed. 517 (1919); *State ex rel. Kansas City v. Public Service Comm'n,* 362 Mo. 786, 244 S.W.2d 110, 116 (1951); *State ex rel. Abeille Fire Ins. Co. v. Sevier,* 33 Mo. 269, 73 S.W.2d 361, 366–67, 371–73 (banc 1934), *cert. denied,* 293 U.S. 585, 55 S.Ct. 99, 79 L.Ed. 680 (1934); *Aetna Ins. Co. v. Hyde,* 327 Mo. 115, 34 S.W.2d 85, 88 (banc 1930). Where, as here, there is no due process right in the utilities to the money so paid, there is no bar to exercise of this power. Further, failure to exercise this power would strip this court of the ability to make a meaningful judgment, for payment under an unlawful order such as the surcharge here at issue will nearly always be already complete by the time the often lengthy appeals process is concluded.

By our inherent power to afford redress to the parties, *see* authorities *supra; cf. State ex rel. Barker v. Assurance Co. of America,* 251 Mo. 278, 158 S.W. 640, 648 (1913), we order the utilities which are parties to this proceeding, and which have received benefits as a result of the erroneous judgment of the court below in permitting the unlawful surcharge, to restore those benefits. We remand to the circuit court for a determination by it of the amounts due as a result of the surcharge and to whom, the proper method of restitution, and in connection therewith a determination of such other matters and the making of such other orders as are necessary to and consistent with this opinion.

BARDGETT and SIMEONE, JJ., concur.

RENDLEN, J., concurs in separate concurring opinion filed.

MORGAN, C. J. and DONNELLY, J., concur and concur in separate concurring opinion of RENDLEN, J.

FINCH, Sr., J., not participating.

WELLIVER, J., not participating because not a member of the court when cause was submitted.

RENDLEN, Judge, concurring.

I agree that there is no statutory authority for a fuel adjustment clause, therefore, I must concur. In these times of energy crises it seems regrettable that we must reach this result. I hope the Legislature will address the problem without undue delay.