SUPREME COURT OF MISSOURI
 en banc

IN THE MATTER OF THE AMENDMENT ) Opinion issued February 9, 2021
OF THE COMMISSION’S RULE )
REGARDING APPLICATIONS FOR )
CERTIFICATES OF CONVENIENCE AND )
NECESSITY; )
KANSAS CITY POWER AND LIGHT AND )
KCP&L GREATER MISSOURI )
OPERATIONS COMPANY, )
 )
 Appellants, )
 )
v. ) No. SC98039
 )
MISSOURI PUBLIC SERVICE )
COMMISSION AND )
DOGWOOD ENERGY, )
 )
 Respondents. )

 APPEAL FROM THE MISSOURI PUBLIC SERVICE COMMISSION

 Kansas City Power & Light Company (“KCP&L”) and KCP&L Greater Missouri

Operations Company (“GMO” and, together with KCP&L, “the Companies”) appeal

from an order of rulemaking issued by the Public Service Commission (“PSC”). In
August 2018, the PSC promulgated 4 CSR 240-20.045, 1 which provided new regulations

related to certificates of convenience and necessity (“CCNs”). The Companies argue that

the order promulgating 4 CSR 240-20.045 exceeds the PSC’s statutory authority and that

the fiscal note accompanying the promulgated regulation is deficient, rendering 4 CSR

240-20.045 void and unenforceable. This Court has jurisdiction pursuant to article V,

section 10 of the Missouri Constitution. Because the order falls within the PSC’s

statutory authority and the fiscal note complies with the applicable statutes, the order is

affirmed.

 Background

 “The PSC is a state agency established by the Missouri General Assembly to

regulate public utilities operating within the state.” State ex rel. Praxair, Inc. v. Mo. Pub.

Serv. Comm’n, 344 S.W.3d 178, 186 (Mo. banc 2011) (quotation marks omitted). The

Companies are electrical corporations and public utilities, as those terms are defined in

section 386.020, 2 and are subject to the PSC’s regulations.

 In April 2018, the PSC filed a notice of proposed rule with the Secretary of State

regarding electric utility applications for CCNs. The PSC sought to rescind a then-

existing regulation, 4 CSR 240-3.105 (2017), and replace it with 4 CSR 240-20.045.

Comments in support of or opposition to the proposed regulation were accepted until

June 14, 2018. KCP&L, GMO, and Dogwood Energy LLC (“Dogwood”) – which owns

1
 When the Code of State Regulations was restructured to reflect the PSC becoming a part of
the Department of Commerce and Insurance, this regulation was transferred to 20 CSR
4240-20.045.
2
 All statutory citations are to RSMo 2016 unless otherwise noted.

 2
the largest interest in the Dogwood Energy Facility, a 650-megawatt natural gas-fired,

combined-cycle electric power-generating facility – submitted written comments. A

public hearing was held on June 19, 2018, at which KCP&L and GMO appeared.

 In August 2018, the PSC filed two orders of rulemaking with the Secretary of

State – one rescinding 4 CSR 240-3.105 and one adopting 4 CSR 240-20.045. The order

adopting 4 CSR 240-20.045 summarized and responded to comments submitted

regarding the proposed rule. The order included a public entity fiscal note pursuant to

section 536.200 stating the cost of compliance for state agencies and political

subdivisions would be less than $500 in the aggregate. The PSC filed a revised private

entity fiscal note pursuant to section 536.205, which estimated that four investor-owned

electric utilities would be affected by the new regulation and that compliance for those

entities would result in an additional aggregate cost of $0 to $100,000. The revised

private entity fiscal note stated the assumed life of the rule was three years and estimated

one additional CCN would be required during that assumed life based on the number of

instances during the previous three years in which a CCN would have been required had

4 CSR 240-20.045 been in force.

 In September 2018, the Companies timely applied for rehearing and requested the

PSC to stay the effectiveness of 4 CSR 240-20.045. The PSC denied rehearing and the

stay. The Companies filed a notice of appeal pursuant to section 386.510. The court of

appeals granted Dogwood intervention. Following disposition by the court of appeals,

this Court granted transfer and has jurisdiction under article V, section 10 of the Missouri

Constitution.

 3
 Analysis

 I. Standard of Review

 “Pursuant to section 386.510, appellate review of an order by the [PSC] is two-

pronged: first, the reviewing court must determine whether the [PSC’s] order is lawful;

and second, the court must determine whether the order is reasonable.” Grain Belt

Express Clean Line, LLC v. Pub. Serv. Comm’n, 555 S.W.3d 469, 471 (Mo. banc 2018)

(quotation marks omitted). All questions of law, including whether statutory authority

exists to support an order of the PSC, are reviewed de novo. See State ex rel. MoGas

Pipeline, LLC v. Pub. Serv. Comm’n, 366 S.W.3d 493, 496 (Mo. banc 2012). An order of

the PSC is reasonable when “the order is supported by substantial, competent evidence on

the whole record; the decision is not arbitrary or capricious; [and] where the PSC has not

abused its discretion.” In the Matter of Verified Application & Petition of Liberty Energy

(Midstates) Corp., 464 S.W.3d 520, 524 (Mo. banc 2015). The PSC’s orders are

presumed to be valid, and the burden is on those challenging the orders to prove their

invalidity. State ex rel. Utility Consumers’ Council of Mo., Inc. v. Pub. Serv. Comm’n,

585 S.W.2d 41, 47 (Mo. banc 1979). This standard applies to the PSC’s orders of

rulemaking. See State ex rel. Atmos Energy Corp. v. Pub. Serv. Comm’n, 103 S.W.3d

753, 758 (Mo. banc 2003).

 II. General Principles Governing the Public Service Commission

 Before answering the questions presented to this Court on appeal, several

principles fundamental to the law governing public utility regulation warrant discussion.

 4
 As this Court has long recognized, “The PSC is a creature of statute and can

function only in accordance with its enabling statutes.” MoGas Pipeline, 366 S.W.3d at

496 (quotation marks omitted). “Its powers are limited to those conferred by statutes,

either expressly or by clear implication as necessary to carry out the powers specifically

granted.” Id. (quotation marks and alteration omitted). The PSC’s enabling statutes of

were first enacted more than a century ago. See § 10412, RSMo 1919 (citing Mo. Laws

1913 at 561) (“A public service commission is hereby created and established, which said

public service commission shall be vested with and possessed of the powers and duties in

this chapter specified, and also all powers necessary or proper to enable it to carry out

fully and effectually all the purposes of this chapter.”). 3 As this Court has concluded, the

General Assembly’s original purpose in establishing the PSC was “to protect the

consumer against the natural monopoly of a public utility, as provider of a public

necessity, while at the same time permitting a recovery by the utility of a just and

reasonable return.” Utility Consumers’ Council of Mo., 585 S.W.2d at 47 (citation

3
 See also 20 Mo. Practice, Administrative Practice & Procedure § 1:2 (4th ed.) (“The [PSC] in
its basic, modern structure was created in 1913. It was the successor to the elected railroad
commission of 1875.... The [PSC’s] rationale was the regulation of often natural monopolies in
order to remedy the shortcomings of competition; its basis was the police power.”) (footnote
omitted); State on inf. Barker v. Kan. City Gas Co., 163 S.W. 854, 860 (Mo. banc 1913) (“The
[PSC] is better equipped with experts, technical knowledge, and other efficient aids to a neutral
and full investigation than would be any commissioner appointed by the court. Its visitorial and
administrative powers are so vast and so flexible as to mold its procedure and orders to the
pressure of the real facts found to exist .... He who reads that act, and does not see a complete
rounded scheme for dealing with the business of public utilities at every spot where the shoe
pinches the public or the utility, reads it to little purpose. He who reads it, and does not see that
the yearning of the lawmaker was to have the courts trust the [PSC] in the first instance to solve
such business problems as those presented in this case, reads it to still less purpose. We
cheerfully bow to the evident intent of the lawmaker, shining on every page of his act as
expressive of the will of the people in constitutional form.”).

 5
omitted). In furtherance of that mission, the PSC has had express statutory authority

from its inception in 1913 to require electrical corporations to apply for CCNs. 4

 The basic statutory structure for CCNs has existed without significant change for

more than 100 years. The electricity industry, on the other hand, has undergone

revolutionary changes and has dramatically expanded in scope and operation since the

PSC’s inception. Without significant changes in its enabling statutes, the PSC,

nonetheless, has maintained its regulatory authority over the industry. The reason for this

expansion of authority is the PSC’s singular, continual mission to regulate the natural

monopoly of a public utility. See id.

 Accordingly, where the PSC is concerned, this Court has maintained some degree

of deference to certain determinations of the agency. For instance, this Court has been

4
 Section 10481, RSMo 1919, contains a nearly identical provision to that of the present
section 393.170:

 No ... electrical corporation ... shall begin construction of a[n] ... electric plant ...
 without first having obtained the permission and approval of the commission. No
 such corporation shall exercise any right or privilege under any franchise
 hereafter granted, or under any franchise heretofore granted by not heretofore
 actually exercised, or the exercise of which shall have been suspended for more
 than one year, without first having obtained the permission and approval of the
 commission. Before such certificate shall be issued a certified copy of the charter
 of such corporation shall be filed in the office of the commission, together with a
 verified statement of the president and secretary of the corporation, showing that
 it has received the required consent of the proper municipal authorities. The
 commission shall have the power to grant the permission and approval herein
 specified whenever it shall after due hearing determine that such construction or
 such exercise of the right, privilege or franchise is necessary or convenient for the
 public service. The commission may by its order impose such condition or
 conditions as it may deem reasonable and necessary. Unless exercised within a
 period of two years from the grant thereof authority conferred by such certificate
 of convenience and necessity issued by the commission shall be null and void.

(Citing Mo. Laws 1913 at 610-11.)

 6
willing to defer to the agency’s interpretation of its own rules, provided that interpretation

was reasonable. See Mo. Pub. Serv. Comm’n v. Union Elec., 552 S.W.3d 532, 539 n.9

(Mo. banc 2018) (“[I]f the meaning of a statute or regulation enforced by the [PSC] is

ambiguous and the canons of construction cannot resolve the issue, this Court is entitled

to give weight to a textually permissible interpretation adopted by the [PSC].”). Further,

the Court grants a presumption of validity to all orders of the PSC. Utility Consumers’

Council of Mo., 585 S.W.2d at 47. Thus, where an action of the PSC does not contravene

the plain language of an enabling statute, the Court recognizes the General Assembly’s

broad grant of authority to the PSC consistent with that agency’s mission and infers a

power the General Assembly intended to vest in the PSC rather than a limitation. Cf.

Grain Belt Express, 555 S.W.3d at 474; Liberty Energy (Midstates) Corp., 464 S.W.3d at

525. Of course, if the General Assembly disagrees, it can amend the PSC’s enabling

statutes to confer as much (or as little) authority on the PSC as it deems appropriate.

 Finally, as is always the case, an agency does not divest itself of the authority

granted to it by its enabling statutes merely by failing to exercise the full extent of that

authority from time to time. Cf. MoGas Pipeline, 366 S.W.3d at 496. Since 1913, the

General Assembly has vested the PSC with “all powers necessary or proper to enable it to

carry out fully and effectually” the agency’s mission. § 386.040; § 10412, RSMo 1919

(citing Mo. Laws 1913 at 561) (same). As this Court has concluded, although

convenience, expedience, and necessity are not proper considerations for determining

whether the PSC has been granted a certain power, the PSC’s enabling “statutes are

 7
remedial in nature and should be liberally construed in order to effectuate the purpose for

which they were enacted.” Utility Consumers Council of Mo., 585 S.W.2d at 49. See

also MoGas Pipeline, 366 S.W.3d at 496 (Even though “section 386.610 provides

that statutes pertaining to the PSC ‘shall be liberally construed with a view to

the public welfare,’ this provision does not authorize the Court to vest the PSC with

authority that the legislature has not granted it either expressly or by clear implication.”).

 III. The Companies’ Points on Appeal

 The Companies appeal from the order adopting 4 CSR 240-20.045, asserting four

points of error. The PSC has authority to adopt rules governing the provision of public

utility service pursuant to section 386.250(6). 4 CSR 240-20.045 was promulgated

pursuant to subsections 1 and 2 of section 393.170. In full, section 393.170 provides:

 1. No gas corporation, electrical corporation, water corporation or sewer
 corporation shall begin construction of a gas plant, electric plant, water
 system or sewer system without first having obtained the permission and
 approval of the commission.
 2. No such corporation shall exercise any right or privilege under any
 franchise hereafter granted, or under any franchise heretofore granted but
 not heretofore actually exercised, or the exercise of which shall have been
 suspended for more than one year, without first having obtained the
 permission and approval of the commission. Before such certificate shall
 be issued a certified copy of the charter of such corporation shall be filed in
 the office of the commission, together with a verified statement of the
 president and secretary of the corporation, showing that it has received the
 required consent of the proper municipal authorities.
 3. The commission shall have the power to grant the permission and
 approval herein specified whenever it shall after due hearing determine that
 such construction or such exercise of the right, privilege or franchise is
 necessary or convenient for the public service. The commission may by its
 order impose such condition or conditions as it may deem reasonable and
 necessary. Unless exercised within a period of two years from the grant
 thereof, authority conferred by such certificate of convenience and
 necessity issued by the commission shall be null and void.

 8
§ 393.170. This section authorizes the PSC to grant a public utility two types of CCNs,

commonly referred to as “line certificates” and “area certificates.” Grain Belt Express,

555 S.W.3d at 471.

 4 CSR 240-20.045 outlines the requirements for a public utility’s application

requesting the PSC grant it a CCN. 4 CSR 240-20.045 provides, in relevant part:

 (1) Definitions. As used in this rule, the following terms mean:
 (A) Asset means:
 1. An electric generating plant, or a gas transmission line that
 facilitates the operation of an electric generating plant, that is
 expected to serve Missouri customers and be included in the
 rate base used to set their retail rates regardless of whether the
 item(s) to be constructed or operated is located inside or
 outside the electric utility’s certificated service area or inside
 or outside Missouri; or
 2. Transmission and distribution plant located outside the
 electric utility’s service territory, but within Missouri;
 (B) Construction means:
 1. Construction of new asset(s); or
 2. The improvement, retrofit, or rebuild of an asset that will
 result in a ten percent (10%) increase in rate base as
 established in the electric utility’s most recent rate case;
 (C) Construction does not include:
 1. The construction of an energy generation unit that has a
 capacity of one (1) megawatt or less; or
 2. The construction of utility-owned solar facilities as
 required under section 393.1665, RSMo;
 3. Periodic, routine, or preventative maintenance; or
 4. Replacement of equipment or devices with the same or
 substantially similar items due to failure or near term
 projected failure as long as the replacements are intended to
 restore the asset to an operational state at or near a recently
 rated capacity level.
 (2) Certificate of convenience and necessity.
 (A) An electric utility must obtain a certificate of convenience and
 necessity prior to –
 1. Providing electric service to retail customers in a service
 area pursuant to section 393.170.2, RSMo;

 9
 2. Construction of an asset pursuant to section 393.170.1,
 RSMo; or
 3. Operation of an asset pursuant to section 393.170.2,
 RSMo.
 (B) The commission may, by its order, impose upon the issuance of
 a certificate of convenience and necessity such condition or
 conditions as it may deem reasonable and necessary.
 (C) In determining whether to grant a certificate of convenience and
 necessity, the commission may, by its order, make a determination
 on the prudence of the decision to operate or construct an asset
 subject to the commission’s subsequent review of costs and
 applicable timelines.
 (D) An electric utility must exercise the authority granted within
 two (2) years from the grant thereof....

4 CSR 240-20.045.

 The Companies argue that 4 CSR 240-20.045 is not supported by statutory

authority and that the accompanying private entity fiscal note is deficient.

 A. Operation of an Asset

 In their first point, the Companies argue section 393.170 authorizes the PSC to

require a CCN only in two specific circumstances: (1) prior to the construction of an

asset and (2) prior to the exercise of any right or privilege under any franchise.

Therefore, the Companies argue the PSC’s requirement for a CCN where an asset is

operated as defined in 4 CSR 240-20.045(1)(A)1 is beyond the statutory authority

granted to the PSC in section 393.170.2. Further, the Companies assert requiring a CCN

prior to the operation of an asset contradicts the statutory purpose of section 393.170.2

and burdens the public interest by imposing an additional regulation without a

corresponding benefit to ratepayers. This Court disagrees.

 10
 In relevant part, section 393.170.2 provides, “No such corporation shall exercise

any right or privilege under any franchise hereafter granted, or under any franchise

heretofore granted but not heretofore actually exercised, or the exercise of which shall

have been suspended for more than one year, without first having obtained the permission

and approval of the commission.” This section enables the PSC to require a CCN when it

determines an electrical corporation will start to exercise (or exercise again following a

pause of at least one year) any right or privilege under a franchise. One such right or

privilege is the operation of an electricity manufacturing plant, i.e., an asset.

 Accordingly, by clear implication of the authority granted to the PSC in section

393.170.2, the PSC has the authority to define “asset” in 4 CSR 240-20.045(1)(A)1 to

include the operation of an asset. This definition is not unreasonable merely because it

encompasses circumstances in which a public utility intends to provide service outside its

designated service area. The point is denied.

 B. Improvement, Retrofit, or Rebuild of an Asset

 In their second point, the Companies argue there is no statutory authority for the

PSC to define “construction” in 4 CSR 240-20.045(1)(B)2 to include any improvement,

retrofit, or rebuilding of an electric plant that will increase the rate base more than 10

percent. The Companies assert section 393.170.1 requires an electric utility to obtain a

CCN prior to construction only of an entirely new electric plant; therefore, the PSC

exceeded its statutory authority when it promulgated 4 CSR 240-20.045(1)(B)2.

 Section 393.170.1 provides, “No ... electrical corporation ... shall begin

construction of a[n] ... electric plant ... without first having obtained the permission and

 11
approval of the commission.” “Construction” is not a statutorily defined term. “Absent a

statutory definition, words used in statutes are given their plain and ordinary meaning

with help, as needed, from the dictionary.” Liberty Energy (Midstates) Corp., 464

S.W.3d at 525 (quotation marks omitted).

 To “construct” means “to put together (as constituent parts) to form, make or

create something : BUILD, FABRICATE” or “to make (something unnatural or artificial)

by fabrication.” Webster’s Third New International Dictionary 489 (1966).

“Construction” means “the act of putting together to form a complete and integrated

object.” Id. Nothing in these definitions requires that every piece must be new, and

nothing prevents the PSC from defining “construction” to include the fabrication of what

is in effect a “new” plant even if many (indeed, most) of the constituent parts were used

previously in the predecessor plant. 5

 The Companies assert that section 393.170.1’s use of the verb “begin” indicates

the General Assembly intended the PSC to require a CCN only when a utility begins

construction of an entirely new electric plant. But this ignores the previous discussion.

Because “construction” can include the sort of improvement, retrofit, or rebuilding

5
 In adopting 4 CSR 240-20.045(1)(B)2, the PSC confronted a question that has confounded
great minds for millennia, i.e., when does rebuilding part of a thing result in an entirely new
thing? Plutarch posited it this way: Theseus returned from Crete, and the Athenians preserved
his ship to honor him. As each plank decayed, it was replaced by a new one. Over time, every
plank had been replaced, yet the Athenians honored the vessel as Theseus’s ship. Were they
correct? Or was this a new ship? If it was a new ship, at what point (i.e., with the replacement
of which plank) did it become a “new” ship? See Plutarch “Theseus (23.1).” Over the centuries,
Thomas Hobbes, John Locke, and many others have toiled in the vineyard of this paradox. The
PSC, for its part, concluded that the tipping point between maintenance and construction is when
the cost increases the utility’s overall rate base by 10 percent. This Court affirms the PSC’s
definition of “construction” in this context.

 12
included in the PSC’s definition of “construction,” the statutory phrase “begin

construction” merely means to initiate that process as defined. Accordingly, the PSC’s

interpretation of its authority under section 393.170.1 is lawful. The PSC’s enabling

statutes authorize it to regulate construction because the costs of such efforts will be

borne by the customers. By requiring a CCN only when the project will increase the rate

base by 10 percent, the PSC meaningfully limits the number of times electric utilities will

have to obtain a CCN and precludes the “slippery slope” argument that one will be

required every time a light bulb is changed. Therefore, 4 CSR 240-20.045(1)(B)2 is

reasonable.

 Nor is the PSC’s decision to include in the definition of “construction” any

improvement, retrofit, or rebuild of an asset that will result in a 10 percent increase in the

utility’s rate base unreasonable on the ground that it was arbitrary, capricious, or an abuse

of discretion. Cf. Cox v. Kan. City Chiefs Football Club, Inc., 473 S.W.3d 107, 114 (Mo.

banc 2015) (“A ruling constitutes an abuse of discretion when it is clearly against the

logic of the circumstances then before the court and is so unreasonable and arbitrary that

it shocks the sense of justice and indicates a lack of careful, deliberate consideration.”).

Plainly, the PSC sought to expand the definition of “construction” beyond merely

erecting an entirely new asset and, as explained above, it had the statutory authority to do

so. Faced with the decision, therefore, of where to draw the line between incidental

changes to an existing asset and “construction” of an asset, the PSC chose to draw it

where the cost of the construction was material to the utility’s customers, i.e., where it

increased the utility’s overall rate base by 10 percent or more. This decision carefully

 13
balanced the need not to unduly burden utilities by imposing a requirement that would be

triggered too often with the PSC’s primary obligation of consumer protection. Utility

Consumers’ Council of Mo., 585 S.W.2d at 47. Defining “construction” in terms of the

percentage of the asset that was being improved, retrofitted, or rebuilt (rather than the rate

base) would not fulfill this obligation because – even though such an activity might well

have a material impact on rates for customers of a utility with only one asset – it would

be much less likely to have a material impact on rates for customers of a utility with

many assets. Defining “construction” in terms of the impact on the utility’s overall rate

base, however, ensures that every improvement, retrofit, or rebuild of an asset that is

likely to have a material impact on rates is reviewed, but those which will not have such

an impact are not reviewed. A decision that carefully balances competing interests, as

this one does, is the antithesis of a decision that is arbitrary, capricious, or an abuse of

discretion. Cf. Cox, 473 S.W.3d at 114. This is true even if one or more utilities (or

even this Court) might have balanced those interests differently. Accordingly, the PSC’s

definition of construction is both lawful and reasonable.

 In reaching this conclusion, the Court rejects the Companies’ arguments that the

way in which the PSC treated retrofits and rebuilds in the past – rather than the statutory

language – must necessarily determine the question of whether the PSC’s adoption of

4 CSR 240-20.045 was rooted in the authority granted to the PSC in statute. By the same

token, the mere fact that the Integrated Resource Planning process pursuant to 20 CSR

240-010 also relates to retrofits, repairs, and improvements, does not bear on the PSC’s

authority to promulgate 4 CSR 240-20.045(1)(B)2 under section 393.170.1. Finally, this

 14
Court rejects the claim that this regulation somehow gives the PSC a forbidden “general

power of management incident to ownership.” State ex rel. Southwestern Bell Tel. Co. v.

Pub. Serv. Comm’n of Mo., 262 U.S. 276, 289 (1923). Instead, it is an exercise of the

express authority granted to the PSC by the legislature in section 393.170.1. The point is

denied.

 C. Out-of-State Assets

 In their third point, the Companies argue there is no statutory authority supporting

the requirement in 4 CSR 240-20.045(1)(A)1 for an electric utility to obtain a CCN prior

to the construction or operation of an electric plant that is not located in Missouri. The

Companies contend that – if section 393.170 is construed to permit the PSC to impose in

4 CSR 240-20.045 a CCN requirement for plants physically located outside Missouri – it

necessarily brings section 393.170 into conflict with section 386.250, which the

Companies contend expressly limits the jurisdiction of the PSC to within the state. The

Companies read section 386.250 too narrowly.

 Section 386.250 provides that the jurisdiction of the PSC is extended to “the

manufacture, sale or distribution of ... electricity for light, heat and power, within the

state ....” The language of the statute allows the PSC to regulate so long as one of three

distinct activities (manufacture, sale, or distribution) occurs within this state. If the

PSC’s jurisdiction were as limited as the Companies claim, the statute would have used

the conjunctive to read “manufacture, sale and distribution of … electricity … within the

state.” An electrical corporation that distributes and sells electricity in Missouri cannot

escape oversight merely by placing its generating plants across the border in another

 15
state, any more than an electrical corporation with generating plants in Missouri can

avoid regulation merely by scheming to ensure that all sales occur elsewhere. As with

the previous point, the fact that the PSC may not – in the past – have regulated to the full

extent of the authority given to it by the legislature has no bearing on whether there is

sufficient statutory authority for the regulation now at issue.

 Accordingly, the limitation placed on the PSC by section 386.250 does nothing to

assist the Companies’ argument. The order promulgating 4 CSR 240-20.045 is

reasonable and within the statutory authority of the PSC. The point is denied.

 D. The Fiscal Note

 In their fourth and final point, the Companies argue 4 CSR 240-20.045 is void

because its fiscal note violates sections 536.205 and 536.215. The Companies contend

the fiscal note incorrectly estimates the aggregate cost of compliance to be between $0

and $100,000 because this calculation assumes the rule will be in effect for only three

years notwithstanding that 4 CSR 240-20.045 contains no sunset provision. Further, the

Companies assert the fiscal note fails to consider the costs of compliance for electric

utilities (such as the Companies) that operate or construct plants outside Missouri.

Finally, the Companies argue the rule is based on the purely speculative presumption that

the 10-percent rate base threshold will never (or only seldom) be reached.

 When a state agency files a notice of proposed rulemaking with the Secretary of

State pursuant to section 536.021 and private entities will incur costs complying with the

proposed rule, section 536.205 requires the agency to file a fiscal note identifying those

costs for publication in the Missouri Register. Section 536.205.1 provides that the fiscal

 16
note must contain: (1) an estimate of the number of business entities likely to be affected

by the adoption of the rule; (2) a classification of the types of business entities likely to

be affected in such a manner as to give those entities reasonable notice; and (3) an

estimate of the aggregate cost for those business entities to comply with the rule. Section

536.215 provides that an agency must file a revised fiscal note if the cost estimate

changes by more than 10 percent during the course of rulemaking.

 In this case, the PSC’s revised private entity fiscal note estimated that four

investor-owned electric utilities would be affected by the new regulation and that their

combined compliance costs would fall somewhere in the range of $0 to $100,000. This

note stated the assumed life of the rule was three years and estimated one additional CCN

would be required during the assumed life of the rule based on the number of instances

during the previous three years where a CCN would have been required had 4 CSR

240-20.045 been in force. The Court rejects the Companies’ arguments and holds that

this fiscal note complied with the statutory requirements.

 The purpose behind the statutory requirement for fiscal notes in section 536.205.1

is to provide useful information to those potentially affected by the proposed rule. The

promulgating agency is not permitted merely to throw up its hands and claim that no one

can see the future with certainty. Instead, fiscal notes are – by definition – forecasts and,

like all forecasts, must be based on various assumptions. When the assumptions are

reasonable and adequately communicated, an affected entity cannot seek to invalidate a

regulation already in effect on the ground that some other assumption should have been

used. Here, the PSC based its estimate on the past three years and adequately

 17
communicated that fact to the reader. Should it have used an assumption of 100 years?

And how would an estimate based on that assumption be any more reasonable – or any

more useful – than the one the PSC made? By saying it expects (based on the past three

years) the new CCN rule will result in one additional application from the four regulated

entities in the next three years, the PSC adequately notified the public and potentially

affected entities of the scope of the burden the new regulation would impose. Sections

536.205 and 536.215 require no more. The point is denied.

 Conclusion

 The order promulgated by the PSC in this case is supported by statutory authority

and reasonable, and the accompanying private entity fiscal note is not deficient.

Accordingly, the final order of rulemaking promulgating 4 CSR 240-20.045 is affirmed. 6

 _____________________________
 Paul C. Wilson, Judge

Draper, C.J., Powell, Breckenridge, Stith and Fischer, JJ., and Bates, Sp.J., concur.
Russell, J., not participating.

6
 The PSC moved to strike four documents from the Companies’ appendices filed in this Court
(and to strike references to those documents in the Companies’ briefs) on the ground that the
documents introduced new evidence on appeal that was not before the PSC. Because the Court
rejects the Companies’ arguments without regard to the documents objected to, the PSC’s motion
is overruled as moot.

 18